13-4069-cr
United States v. Spruill

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2014

(Argued: October 1, 2014     Decided: December 16, 2015)

Docket No. 13-4069-cr

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JEFF SPRUILL,

*Defendant-Appellant.*

Before:

POOLER, RAGGI, and HALL, *Circuit Judges.*

On appeal from a judgment of conviction entered in the United States

District Court for the District of Connecticut (Chatigny, *J.*), defendant invokes

<u>United States v. Thomas</u>, 116 F.3d 606 (2d Cir. 1997), to argue that the district court committed plain error in dismissing an alleged holdout juror for cause under Fed. R. Crim. P. 23. <u>Thomas</u> does not support defendant's argument because the principles it enunciated do not pertain here, where the cause for dismissal was extrinsic bias determined without intrusion into juror deliberations. In any event, defendant waived any challenge to the inquiry and dismissal of the juror at issue by specifically telling the district court that he did not object to either and by, in fact, recommending the very disposition he now challenges. The remainder of defendant's arguments on appeal are addressed in a summary order issued the same day.

Judge POOLER dissents in a separate opinion.

AFFIRMED.

———————

SARALA V. NAGALA, Assistant United States Attorney (Marc H. Silverman, Assistant United States Attorney, *on the brief*), *for* Deirdre M. Daly, United States Attorney for the District of Connecticut, New Haven, Connecticut, *for Appellee*.

HARRY SANDICK (Andrew D. Cohen, *on the brief*), Patterson, Belknap, Webb & Tyler L.L.P., New York, New York, *for Defendant-Appellant*.

———————

2

REENA RAGGI, *Circuit Judge*:

Defendant Jeff Spruill appeals from a judgment of conviction entered on July 12, 2013, in the United States District Court for the District of Connecticut (Robert N. Chatigny, *J.*), after a jury trial at which he was found guilty of two counts of possession with intent to distribute and distribution of cocaine and cocaine base (Counts One and Two), one count of possession with intent to distribute cocaine (Count Three), and one count of unlawful possession of a firearm by a convicted felon (Count Four). See 18 U.S.C. §§ 922(g)(1), 924(a)(2); 21 U.S.C. § 841(a)(1), (b)(1)(C). Spruill argues that the district court erred in dismissing a "holdout" juror for cause during the course of jury deliberations, in violation of principles enunciated in United States v. Thomas, 116 F.3d 606 (2d Cir. 1997). He also challenges the sufficiency of the evidence supporting his convictions on Counts One, Two, and Four; the procedural reasonableness of his sentence, in particular the district court's application of a career offender enhancement under U.S.S.G. § 4B1.1; and the effectiveness of former counsel's representation in failing to challenge the § 4B1.1 enhancement. In a supplemental pro se brief, Spruill further argues that knowledge of "drug type"

3

is a here-unproved predicate element of the drug offenses for which he was convicted.[1]

As we explain herein, Spruill's juror removal challenge fails for two reasons. First, the challenged removal is not subject to Thomas's "any possibility" rule, see 116 F.3d at 621–22, because the concern underlying Thomas, juror nullification, was not here at issue. Rather, removal was based on extrinsic bias, a matter about which the district court could—and did—inquire without intruding on jury deliberations. See id. at 621. Second, Spruill waived any challenge to dismissal of the juror in question by specifically telling the district court that he did not object either to its colloquy with the juror or to the juror's removal, and by in fact recommending the very disposition he now challenges.

For reasons explained in a summary order issued this same day, we reject Spruill's remaining counseled and pro se arguments.

Accordingly, we affirm the judgment of conviction.

---

[1] On March 4, 2015, months after this case was argued, Spruill's appellate counsel moved for leave to allow Spruill to file a supplemental pro se brief. This Court granted the motion and subsequently received Spruill's supplemental brief and the Government's response.

## I.    Background

### A.    Controlled Purchases

In the summer of 2012, two confidential informants under the direction of Middletown, Connecticut police purchased cocaine and cocaine base from defendant Spruill.  The second purchase was made at 18 Glover Place, home of Spruill's girlfriend, Chanelle McCalla.

### B.    Search Warrant

Soon thereafter, police applied for and were granted a warrant to search 18 Glover Place and Spruill's person.  Upon executing the warrant, police found Spruill to be carrying on his person two small plastic bags, one containing marijuana and the other containing cocaine.[2]

At 18 Glover Place, they discovered men's clothing and toiletries in the master bedroom, as well as a bullet, which McCalla claimed was a souvenir from a date at a shooting range.  An unlocked door near the entrance to the master bedroom led to the attic, where police found plastic bags containing Spruill's

---

[2] Spruill does not challenge his conviction for the controlled substance found on his person.

5

clothing, as well as garbage bags containing a bulletproof vest and two leather bags, from which police seized a .357-caliber handgun, a .40-caliber handgun with three boxes of ammunition, and a .380-caliber pistol with one box of ammunition.

### C.    Trial: Jury Selection & Deliberations

Jury selection in Spruill's case took place on July 9, 2013.  The focus of our attention on this appeal is Juror 11.[3]  During voir dire, this juror identified herself as a "clinician in the State of Connecticut . . . do[ing] outreach in the prison systems in Hartford."  App. 51.  Juror 11 explained that "it's not a reason not to serve . . . I'm just thinking like if somebody's found guilty, I could also see this person in the prison system."  Id.[4]  In response to a follow-up question from Judge Chatigny asking whether any jurors had "experiences or connections . . . involving law enforcement," Juror 11 explained that she worked in the

---

[3] "Juror 11" denotes the juror's place on the petit jury.  During voir dire, this individual was denominated Juror 27.  To limit potential confusion, we use the petit jury designation, Juror 11, to refer to this juror throughout our discussion.

[4] The district court thereafter explained the difference between the state and federal prison systems to assuage any concern Juror 11 might have had as to the likelihood of future contact with Spruill.

Connecticut Offender Reentry Program, and that the Program's mission is to help inmates with mental health issues receive treatment and to "represent them in the prison and [to] work on their . . . life goals." Id. at 53, 56.

Spruill's counsel initially applied, but then withdrew, a peremptory challenge to Juror 11. The record reflects the following exchange:

> THE COURT: Mr. Weingast [defense counsel], I'm just interested in why you removed [Juror 11].
>
> MR. WEINGAST: We discussed that very carefully. The fact that she worked in prisons . . . was basically what tipped the scales . . . .
>
> THE COURT: What is your concern?
>
> MR. WEINGAST: I think with work, she's a bit jaded. That was a decision by both me and my client.
>
> THE COURT: But Mr. Spruill wanted you to remove her?
>
> MR. WEINGAST: Yes, Your Honor. Can I just doublecheck?
>
> THE COURT: Yes.
>
> (Pause)
>
> MR. WEINGAST: We'll keep her instead.
>
> THE COURT: I'm sorry?
>
> MR. WEINGAST: We'll keep her.

. . . .

THE COURT:  To be clear, Mr. Weingast, I don't want Mr. Spruill to think that I am here to influence his exercise of peremptories, because I'm not.

MR. WEINGAST:  No, Your Honor absolutely not.  This is . . . one we weighed very carefully, and on balance with what the Court just said, we talked about it some more and my client would like to keep her.

THE COURT:  Okay.

Id. at 116–17.  Juror 11 ultimately served on the jury.

After the close of evidence, during deliberations, the court received two jury notes in close succession.  The first revealed that the jury was divided, apparently 11 to 1, and sought clarification as to the law of constructive possession:

Your Honor, we have one juror that at this point that does not agree with the jury.  He/she has doubts and at this point is unwilling to change their vote.  There is also the law for constructive possession and clarity on the law.  We would like you to confirm that we should take what is stated on page 20 as law.

The majority of the jurors are unwilling to stop too quickly at the expense of justice.  How should we proceed?  Do we continue discussing the points?

Id. at 521. The second note indicated one juror's concern about a conflict of interest:

> We have one juror who feels in their gut that they have a conflict of interest. We need to understand how to proceed.

Id.

Invited to comment on the first note, both the prosecutor and Spruill's counsel stated that the jury did not appear deadlocked and should be instructed to continue deliberations. As to the second note, counsel agreed that it was not clear whether the "holdout" juror in the first note and the "conflicted" juror in the second note were one and the same. With counsel's agreement, the court decided to give the jury further instruction.

In response to the first note, the court reminded the jurors that "[e]ach of you must decide the case for yourself" and "if after carefully considering all the evidence and the arguments of your fellow jurors you entertain a conscientious view that differs from the others, you are not to yield your conviction simply because you are outnumbered." Id. at 530–31. This immediately prompted a third note, requesting a definition of "conscientious view." The court explained, "the term refers to a view of the case based on fair and impartial consideration of

all the evidence and full and fair discussion of the issues in the case with the other jurors." Id. at 532. The court then asked counsel whether they agreed with the stated definition, and both responded with approval.

Addressing the second note, the district court instructed the jury on "conflict of interest" as follows:

> Like judges, jurors are required to be impartial and unbiased. A juror is not permitted to have a personal bias for or against any party.
>
> A conflict of interest can arise when a juror has a financial interest in a case, knows one of the lawyers or parties or witnesses, or has been personally involved in a situation like the one at issue in the case.
>
> A conflict of interest is in the nature of a personal stake or involvement in the case that makes it difficult for the individual to be fair and impartial, to decide the case based solely on the evidence and the applicable law, not on anything else.
> . . . .
> [I]f after considering these brief comments it appears that there may be a conflict of interest, then that is something that would need to be disclosed and I would need to address it.

Id. at 533–34. When the jury resumed its deliberations, the court confirmed that counsel had no objections to any part of the instruction given: "Not from the government, Your Honor"; and "No, Your Honor, thank you," from Spruill's counsel. Id. at 535.

10

Shortly thereafter, the court received a fourth note, this time from Juror 11, which stated as follows:

> I had concerns during jury selection about being in a position where I have involvement with similar cases when working with individuals with similar charges. After hearing deliberations, I'm finding my "gut feeling" is potentially creating a bias.
>
> If possible, it may make sense to be replaced at this time by another juror.

Id. at 536. The court shared the note with counsel and solicited guidance on how to proceed. Agreeing with the Government, Spruill's counsel urged further inquiry:

> I think the Court would need to inquire of her whether she can set aside the bias and deliberate, and I suppose also the nature of the bias so that we know if it's something that is truly a bias in terms of jury deliberations. . . .
>
> I think the court needs to inquire of her individually.

Id. at 537–38.

In discussing how to conduct such an inquiry without intruding on jury deliberations, see id. at 538–39 (observing, "I don't want to intrude on the jury's deliberations, I don't want to know about the jury deliberation, but I need to

11

respond intelligently to this note"),[5] the district court posited two scenarios: "either [1] Juror 11 has a conscientious view that differs from everybody else or [2] she's having difficulty deliberating as she would wish to do because of what might be thought of as sympathy for Mr. Spruill," id. at 539. With counsels' consent, the court then called Juror 11 into the courtroom.

Before making any inquiry, Judge Chatigny cautioned the juror:

[I]t's important that you not reveal to me anything about the jury deliberations. . . . That's a matter for the jury alone and we need to respect the confidentiality of the jury's work and the secrecy of the jury's deliberations. But with regard to your own personal situation as a juror, we can talk about whatever problem is causing you concern.

Id. at 541.

Juror 11 explained that her employment experience was the source of her concern:

I think when we had the jury selection . . . I had mentioned [that] I work in the prison system and I work with inmates all the time. And I feel . . . like that was sort of a conflict in the beginning. . . . But

_____

[5] The record consistently demonstrates Judge Chatigny's commendable caution in identifying the concerns presented by the court's inquiry of a deliberating juror regarding a potential conflict, and in further consulting with counsel before every action taken.

I said, okay, well, maybe there isn't a problem, because I presented it to you as a judge and you continued to let me stay in there, so I figured it probably wasn't a problem.

. . . I'm trying to do my best . . . to make the best unbiased decisions, but I also am feeling like my work and my involvement with people in that matter and the things that I've heard from other inmates in cases, similar cases that they have like this—you know, I work with people that have had drug convictions and things like that—and things that they say to me . . . [are] somewhat clouding my views. I'm trying not to. . . . I'm trying to look at the evidence and trying to make a decision on all that, and I feel like in some ways I kind of am. But somebody mentioned—I can't bring up the deliberations, but it just kind of made me think about it and it's just been difficult.

And they were asking me all this stuff and I was, look, I don't know, you know. So I'm just trying to be honest about it. I'm trying to do my best . . . .

Id. at 542–43. The court then asked, "So in a very real sense, you have clients who are similarly situated to Mr. Spruill?" id. at 543, to which Juror 11 replied:

Yes. I've had experience with that.
. . . .
And a lot of [my clients] have mentioned things to me that makes me think about the system and things—I don't know what's truth and what's not—to create some cloudiness in my head about certain things.

Id. at 543–44.

13

The court then presented Juror 11 with the two possible scenarios discussed previously with counsel, and she replied:

> I'm trying to be as fair as I can be and I feel like I've been trying to listen to all the evidence and I feel like I was coming to a fair decision, but I feel like other members also felt maybe I didn't, you know. So I don't know where I feel like if I can even—I don't know. I mean, for [the] interest of the Court and everybody's time, it might just make sense to have somebody else. I just don't know.

Id. at 546. The court made no decision at that time as to whether Juror 11 could continue to serve or should be dismissed. Instead, it suggested to Juror 11 that she take time to consider whether she could "fairly and impartially judge the case based solely on the evidence." Id. It directed her not to "be concerned about time or imposing on other people," and "simply [to] focus on whether you are able to be a fair and impartial judge of the case or whether it's really not a suitable case for you given the work that you do." Id. at 547.

After the juror departed the courtroom, the court asked counsel whether they had "[a]ny objection to anything that happened just now," to which both responded, "No, Your Honor." Id. at 548. The court again solicited guidance on how to proceed, whereupon Spruill's attorney stated, "I think we just need to give her a few minutes . . . . We just have to recess and . . . be nearby . . . ." Id.

14

A short time later, the court received a fifth note. Therein, Juror 11 asked to be dismissed, stating that she was having "some difficulty in making a decision on a verdict based on feelings of sensitivity toward individuals who have similar cases to Mr. Spruill." Id. at 549. When Judge Chatigny invited comment, the prosecutor stated that Juror 11 "should be excused at this point." Id. at 550. Asked whether he agreed, Spruill's counsel responded, "Yes, Your Honor." Id. The court then dismissed Juror 11, replacing her with an alternate.

The jury began its deliberations anew, and soon thereafter returned a guilty verdict on all counts.

D.    Sentencing

At Spruill's October 10, 2013 sentencing hearing, the court considered the Presentence Investigation Report ("PSR") in determining Spruill's sentencing range under the United States Sentencing Guidelines. Referencing a transcript of state court proceedings at which Spruill had pleaded guilty to (1) the sale of narcotics in violation of Conn. Gen. Stat. 21a-277(a) and (2) possession of narcotics with intent to sell in violation of Conn. Gen. Stat. 21a-277(a), the PSR recommended that a § 4B1.2 enhancement be applied to Spruill's firearm

15

conviction and that he be designated a career offender under § 4B1.1, yielding a Guidelines range of 210 to 262 months' imprisonment. With objections not relevant here, the court adopted the PSR's calculation, considered the factors set out in 18 U.S.C. § 3553(a), and sentenced Spruill to a below-Guidelines sentence of 120 months' imprisonment.

This timely appeal followed.

## II.   Discussion

Citing language in United States v. Thomas, 116 F.3d 606 (2d Cir. 1997), stating that "'if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request,'" id. at 621–22 (emphasis omitted) (quoting United States v. Brown, 823 F.2d 591, 596 (D.C. Cir. 1987)), Spruill argues that the district court erred in dismissing Juror 11 because she was the holdout against conviction based on doubts as to the sufficiency of the evidence, see id. at 622 & n.11. Because Spruill did not object to Juror 11's dismissal in the district court, we would normally review the challenged decision only for plain error. See United States v. Marcus, 560 U.S. 258, 262 (2010) (holding that party

16

claiming plain error must show (1) error; (2) that is clear or obvious, rather than subject to reasonable dispute; (3) that affected party's substantial rights; and (4) that seriously affected fairness, integrity, or public reputation of judicial proceedings); United States v. Wernick, 691 F.3d 108, 113 (2d Cir. 2012). As we explain in the next section of this opinion, Spruill cannot demonstrate plain error because Juror 11 was not removed for possible nullification, the concern underlying Thomas's "any possibility" rule, but, rather, for extrinsic bias, which the district court was able to assess without intruding on jury deliberations. In any event, Spruill did not simply forfeit but, rather, waived any challenge to the district court's inquiry and dismissal of Juror 11 by affirmatively agreeing to those actions.

A.    The Alleged Plain Error Under *Thomas*

To demonstrate error in the removal of a deliberating juror for cause under Fed. R. Crim. P. 23(b), Spruill must show that the district court abused the considerable discretion it is accorded in this area. See United States v. Simmons, 560 F.3d 98, 109 (2d Cir. 2009); cf. United States v. Farhane, 634 F.3d 127, 168 (2d Cir. 2011) (according district court "broad flexibility" in handling alleged juror

17

misconduct, "mindful that addressing juror misconduct always presents a delicate and complex task, particularly when the misconduct arises during deliberations" (internal quotation marks and citations omitted)).[6] Such discretion extends to decisions whether, and to what degree, to question a deliberating juror regarding circumstances that may give cause for removal. See United States v. Baker, 262 F.3d 124, 129 (2d Cir. 2001). Such questioning must be pursued cautiously, however, so as not to intrude on one of the cornerstones of our jury system: preservation of the secrecy of jury deliberations. See United States v. Thomas, 116 F.3d at 618 (observing that "delicate and complex task" of investigating reports of juror misconduct or bias becomes "particularly sensitive" where court investigates allegations of juror misconduct during deliberations).

Spruill's claim that Juror 11's removal was Thomas error ignores a critical context difference. The concern here was juror partiality or bias attributable to

---

[6] We have observed that where a juror is the "lone holdout for acquittal" that juror's removal must be "meticulously scrutinized." United States v. Hernandez, 862 F.2d 17, 23 (2d Cir. 1988); accord United States v. Thomas, 116 F.3d at 624–25. But even in such cases, what the removal is scrutinized for is abuse of discretion. See United States v. Baker, 262 F.3d 124, 129–30 (2d Cir. 2001) (applying abuse of discretion standard in rejecting Thomas challenge to apparent holdout juror).

18

an extrinsic cause: the juror's employment experience. In Thomas, the concern was possible juror nullification, i.e., a purposeful refusal to consider the evidence and the court's instructions on the law in reaching a verdict. See id. at 614. Thomas stated that "a juror who intends to nullify the applicable law is no less subject to dismissal than is a juror who disregards the court's instructions due to an event or relationship that renders him biased or otherwise unable to render a fair and impartial verdict." Id. At the same time, Thomas recognized that where "no allegedly prejudicial event or relationship" is at issue, id. at 621, juror disregard of the law is "a particularly difficult allegation to prove and one for which an effort to act in good faith may easily be mistaken," id. at 618. Thus, a court presented with a claim of nullification during deliberations confronts a serious dilemma. Without an adequate inquiry, the court may remove a juror who is simply unpersuaded by the Government's case, which would deny the defendant his right to a unanimous verdict. See id. at 621. But to conduct such an inquiry of a deliberating juror suspected of nullification necessarily gives rise to an "especially pronounced" conflict between a trial court's "duty to dismiss jurors for misconduct" and its duty to "safeguard[] the secrecy of jury

19

deliberations." Id. at 618.  It was to balance these concerns properly that Thomas

pronounced a strict limitation on the removal of a deliberating juror "in any case

where the juror allegedly reuses to follow the law":  "if the record evidence

discloses any possibility that the request to discharge stems from the juror's view

of the sufficiency of the government's evidence, the court must deny the

request."  Id. at 621–22 (emphasis and internal quotation marks omitted).[7]  It was

because the record in Thomas admitted such a possibility that we concluded that

the district court erroneously removed the juror.  See id. at 624.

---

[7] The first quotation belies our dissenting colleague's assertion that "[n]othing in Thomas . . . suggests that the 'any possibility' standard applies only in the juror nullification context."  Dissenting Op., post at **[4]**.  Indeed, Thomas makes the point again in pronouncing the standard "an imperfect rule" that, while "leav[ing] open the possibility that jurors will engage in irresponsible activity . . . outside the court's power to investigate or correct," nevertheless serves a system of justice where "the judge's duty and authority to prevent nullification and the need for jury secrecy co-exist uneasily."  United States v. Thomas, 116 F.3d at 622 (emphasis added).  The Thomas footnote cited by the dissent itself makes clear that nullification is the concern of the any possibility rule:  "Accordingly, if the record raises any possibility that the juror's views on the merits of the case, rather than a purposeful intent to disregard the court's instructions, underlay the request that he be discharged, the juror must not be dismissed."  United States v. Thomas, 116 F.3d at 622 n.11 (emphasis omitted and emphasis added).

20

Thomas itself recognized that where concerns as to a deliberating juror's continued ability to serve arise in a context other than nullification—for example, juror unavailability or incapacitation—its strict "any possibility" rule is not required because a trial judge can "conduct a thorough examination of the basis for removal" and "make appropriate findings of fact," including juror credibility, "without any inquiry into the juror's thoughts on the merits of the case." Id. at 620 (emphasis in original). Thomas observed that "[t]he need to protect the secrecy of jury deliberations begins to limit the investigatory powers where the asserted basis for a deliberating juror's possible dismissal is the juror's alleged bias or partiality in joining or not joining the views of his colleagues." Id. at 620–21 (emphasis added). But Thomas did not apply the "any possibility" rule to all such claims. Rather it recognized that where the claimed bias or partiality is attributable to an extrinsic event, a judge might well be able to determine its prejudicial likelihood "without intrusion into the deliberative process." Id. at 621; see United States v. Egbuniwe, 969 F.2d 757, 762–63 (9th Cir. 1992) (cited approvingly in Thomas) (upholding removal of deliberating juror whose girlfriend had been arrested and mistreated by police); United States v. Ruggiero,

928 F.2d 1289, 1300 (2d Cir. 1991) (upholding dismissal of deliberating juror subjected to intimidation by two men in driveway); United States v. Casamento, 887 F.2d 1141, 1186–87 (2d Cir. 1989) (upholding dismissal of deliberating juror whose daughter received threatening phone call).  In short, by contrast to cases of alleged nullification, where "the judge may well have no means of investigating the allegation without unduly breaching the secrecy of deliberations," in cases of possible bias from extrinsic factors, "the presiding judge can make appropriate findings and establish whether a juror is biased or otherwise unable to serve without delving into the reasons underlying the juror's views on the merits of the case [because] an event or relationship itself becomes the subject of investigation."  United States v. Thomas, 116 F.3d at 621.  Thus Thomas mandated its "any possibility" rule in the former circumstance but not in the latter.  See id. at 623 (stating that it adopted rule in nullification context because where "duty and authority to prevent defiant disregard of the law or evidence comes into conflict with the principle of secret jury deliberations, we are compelled to err in favor of the lesser of two evils—protecting the secrecy of

jury deliberations at the expense of possibly allowing irresponsible juror activity").

Since Thomas was decided, this court has reiterated that its strict "any possibility" rule does not reach beyond nullification to other forms of juror misconduct. Notably, in United States v. Baker, 262 F.3d at 131–32, we identified a "subtle, but important," distinction between a juror "determin[ed] to vote without regard to the evidence" and a juror who admittedly "refused to participate in deliberations as required by her obligations as a juror," such that the "stringent rule announced in Thomas" applied in the former circumstance but not in the latter. See id. (explaining that "stringent rule announced in Thomas . . . is based on the difficulty in detecting the difference between a juror's illegal act of nullification . . . and the juror's failure to be convinced of the defendant's guilt"; where "juror refused to participate in deliberations as required by her obligations as a juror, the rule of Thomas does not apply . . ."). Thus, we held that the district court acted within its discretion in removing a juror who had "improperly made up her mind prior to the beginning of

23

deliberations and refused to engage in deliberations with the other jurors." Id. at 130.

Our sister circuits also have recognized that the Thomas rule does not apply where a district court can safely distinguish between instances of actual juror misconduct and a juror's views on the merits, such as in cases involving partiality or bias that can be assessed without reference to the jury's deliberations. See United States v. Symington, 195 F.3d 1080, 1087 n.6 (9th Cir. 1999) (distinguishing between allegations that go to "quality and coherence" of juror's views on merits, which require strict Thomas-based standard of dismissal, and questions of juror bias or competence that focus on some identifiable event or relationship, which do not demand strict standard); see also United States v. Kemp, 500 F.3d 257, 303 n.25 (3d Cir. 2007) (observing that strict no-reasonable-possibility rule does not apply in "many instances" of alleged juror bias where district court can "focus on the existence of a particular act that gives rise to the bias").

Applying these principles here, we observe that even if the record suggests that Juror 11 was a holdout, it raises no nullification concern as in Thomas. To

the contrary, the record indicates that Juror 11 understood and accepted the duty to base a verdict on the evidence and the law, but that she herself voiced concern about her ability to perform that duty in light of an extrinsic factor: her work in the state prison system, which may have been causing a bias in favor of defendant. This is not a circumstance akin to Thomas, where an excusal inquiry necessarily risked intrusion on jury deliberations as to require application of a strict "any possibility" standard to the district court's removal decision. Rather, it is a circumstance where the removal inquiry and decision could, and did, focus on the extrinsic matter identified.

This is not to ignore the challenges confronting the district court in making a decision to excuse Juror 11. As the able trial judge recognized, initially the juror herself was not clear as to whether she was, in fact, operating under an actual bias favoring defendant, or whether she simply possessed a conscientious view of the evidence at odds with her fellow jurors. See App. 539 (observing that Juror 11 either "has a conscientious view that differs from everybody else or she's having difficulty deliberating as she would wish to do because of what might be thought of as sympathy for Mr. Spruill"). Compare id. at 536 (stating,

25

in jury note, that "I had concerns during jury selection about being in a position where I have involvement with similar cases when working with individuals with similar charges," and that "[a]fter hearing deliberations, I'm finding my 'gut feeling' is potentially creating a bias"), with id. at 542 ("I'm trying to look at the evidence and trying to make a decision on all that, and I feel like in some ways I kind of am.").

Judge Chatigny, however, was careful to resolve that ambiguity with minimal inquiry of the juror, and certainly without any inquiry into the juror's views of the evidence. Cf. United States v. Baker, 262 F.3d at 132 (observing, in upholding dismissal of deliberating juror, that "it is often difficult to steer such interviews clear of revealing the jurors' views"). He commendably afforded the juror additional time to consider for herself whether she was "able to be a fair and impartial judge of the case or whether it's really not a suitable case for you given the work that you do." App. 547; see generally United States v. Nelson, 277 F.3d 164, 202–03 (2d Cir. 2002) ("[I]t is important that a juror who has expressed doubts about his or her impartiality also unambiguously assure the district court, in the face of these doubts, of her willingness to exert truly best

26

efforts to decide the case without reference to the predispositions and based solely on the evidence presented at trial." (emphasis in original)). Moreover, he ensured that the juror would feel no pressure to make a hasty decision, emphasizing that she should not be concerned with the amount of time needed or any possible inconvenience. See App. 546–47.

After taking some time, Juror 11 reported to Judge Chatigny that she was having "some difficulty in making a decision on a verdict based on feelings of sensitivity toward individuals who have similar cases to Mr. Spruill." Id. at 617 (emphasis added). On this record, and with no intrusion whatsoever on jury deliberations, the district court was able to determine—and both prosecution and defense counsel agreed—that Juror 11 needed to be removed for extrinsic bias. These circumstances are thus distinguishable from Thomas, and not controlled by its "any possibility" rule. See United States v. Baker, 262 F.3d at 131–32.

Accordingly, Spruill cannot show error, let alone plain error, in the dismissal of Juror 11. See generally United States v. Ruggiero, 928 F.2d at 1300 (observing that appellate court "would be rash indeed to second guess the conclusion of the experienced trial judge, based in large measure upon personal

observations that cannot be captured on a paper record, that [the juror] was disabled by fear from continuing to participate in the jury's deliberations"); see also United States v. Baker, 262 F.3d at 129, 131 (upholding dismissal where record indicated deliberating juror was not removed for "nonconforming view of the evidence," notwithstanding her insistence that views were "based on the evidence"). In any event, Spruill confronts an even higher hurdle than plain error, because, as we explain in the next section, his challenge to Juror 11's removal is precluded by waiver.

B. Spruill's Waiver of Any Challenge to Inquiry and Removal of Juror 11

Under Fed. R. Crim. P. 52(b), this court has discretion to correct errors that were forfeited because not timely raised in the district court, but no such discretion applies when there has been true waiver. See United States v. Olano, 507 U.S. 725, 731–34 (1993); United States v. Kon Yu-Leung, 51 F.3d 1116, 1121 (2d Cir. 1995) (explaining that "forfeiture does not preclude appellate consideration of a claim in the presence of plain error, whereas waiver necessarily 'extinguishes' the claim altogether"). Forfeiture occurs when a defendant, in most instances due to mistake or oversight, fails to assert an

28

objection in the district court.  See United States v. Kon Yu-Leung, 51 F.3d at 1122 ("If a party's failure to take an evidentiary exception is simply a matter of oversight, then such oversight qualifies as a correctable 'forfeiture' for the purposes of plain error analysis."); see also United States v. Nouri, 711 F.3d 129, 138 (2d Cir. 2013) (reviewing jury instruction for plain error where defendant failed to make timely objection at trial); United States v. Gore, 154 F.3d 34, 42 (2d Cir. 1998) (observing that defendant's failure to present timely argument or objection to merger issue amounted to forfeiture).  By contrast, waiver can result only from a defendant's intentional decision not to assert a right.  See United States v. Quinones, 511 F.3d 289, 321 n.21 (2d Cir. 2007) (defining waiver as "intentional relinquishment or abandonment of a known right" (internal quotation marks omitted)); accord United States v. Ferguson, 676 F.3d 260, 282 (2d Cir. 2011); see also United States v. Zubia-Torres, 550 F.3d 1202, 1205 (10th Cir. 2008) (observing that "waiver is accomplished by intent, but forfeiture comes about through neglect" (alterations and internal quotation marks omitted)).  We here identify such intentional action by Spruill with respect to the district court's inquiry and removal of Juror 11.

29

Various circumstances can manifest a defendant's intentional relinquishment of a known right. For example, this court has recognized waiver where a party actively solicits or agrees to a course of action that he later claims was error. See, e.g., United States v. Quinones, 511 F.3d at 320–22 (stating that defendants who solicited and agreed to erroneous jury instruction that, if death penalty were not imposed, life imprisonment was mandated, could not later claim that imposition of life sentence was plain error); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (concluding that defendant who welcomed admission of evidence relating to gang membership waived right to appeal admission of that evidence); see also United States v. Teague, 443 F.3d 1310, 1316 (10th Cir. 2006) (stating that when defendant, through counsel, proposed and agreed to conditions of supervised release, defendant could not later appeal conditions). We have identified waiver where a party asserts, but subsequently withdraws, an objection in the district court. See, e.g., United States v. Weiss, 930 F.2d 185, 198 (2d Cir. 1991) (holding that defendant who withdrew objection to exclusion of documents waived right to appeal exclusion); see also United States v. Zubia-Torres, 550 F.3d at 1205 ("We typically find waiver in cases where . . . a

party attempts to reassert an argument that it previously raised and abandoned below."); United States v. Denkins, 367 F.3d 537, 543–44 (6th Cir. 2004) (holding that defendant waived any competency challenge to guilty plea where counsel secured competency evaluation but later abandoned competency argument and withdrew any previous objections).  We have also recognized waiver where a party makes a "tactical decision" not to raise an objection.  United States v. Kon Yu-Leung, 51 F.3d at 1122–23 (holding that, where defendant objects to certain evidence as irrelevant and prejudicial but opts, as tactical matter, not to object to other evidence, such inaction "constitutes a true 'waiver,' which will negate even plain error review"); accord United States v. Quinones, 511 F.3d at 321.  In each of these circumstances, the record has supported the critical determination that the defendant, through counsel, acted intentionally in pursuing, or not pursuing, a particular course of action.[8]

---

[8] Judge Pooler observes that Spruill did not personally waive any objection to the removal of Juror 11.  See Dissenting Op., post at **[10]**.  To be sure, personal waiver is required for certain rights; a defendant "has the ultimate authority to determine whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal."  Florida v. Nixon, 543 U.S. 175, 187 (2004) (internal quotation marks omitted).  But while "there are basic rights that the attorney cannot waive

31

The record in this case convincingly demonstrates that Spruill, through counsel, also acted intentionally when he affirmatively agreed to and, at times, even recommended the actions he now challenges with respect to the removal of Juror 11. Thus, his Thomas argument is not simply forfeited without plain error, but waived.

From the start of trial, and long before jury deliberations commenced, Spruill was aware that Juror 11's employment might affect her jury service. Indeed, during voir dire, Spruill initially exercised, but then withdrew, a peremptory challenge to Juror 11 based on concern that she might be "jaded" because of her work. App. 116. Thus, when, during jury deliberations, Juror 11 expressed concern about a possible conflict based on her work, Spruill

without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval." Taylor v. Illinois, 484 U.S. 400, 417–18 (1988) (footnote omitted). Spruill has nowhere argued that his consent to the removal of a deliberating juror had to be personal rather than through counsel to foreclose a challenge on appeal. Nor has the dissent cited any authority supporting that conclusion. As the cited cases show, most waivers are effected through counsel. And as we observe infra at **[37–39]**, a defendant who thinks his attorney's waiver of a point was unreasonable and prejudicial may have a Sixth Amendment claim for ineffective representation.

32

specifically urged the district court to undertake the very inquiry of Juror 11 that he now challenges.

> I think the Court would need to inquire of her whether she can set aside the bias and deliberate, and I suppose also the nature of the bias so that we can know if it's something that is truly a bias in terms of jury deliberations. . . .
>
> I think the Court needs to inquire of her individually.

Id. at 537–38. A colloquy ensued in which the district court remarked that it was "reasonable to infer that the jury has taken a vote on the merits and Juror 11 is alone in opposing the other jurors," either because she had a "conscientious view that differs from everybody else" or because "she's having difficulty deliberating as she would wish to do because of what might be thought of as sympathy for Mr. Spruill." Id. at 538–39. Even after hearing these observations—which anticipate the argument he makes on appeal—Spruill expressed only support for, not opposition to, the district court's questioning of Juror 11. Notably, when Judge Chatigny advised the parties that he wished, "with your consent," to inquire further of Juror 11, Spruill's counsel provided that consent: "Yes, Your Honor, thank you." Id. at 540. At this juncture, Spruill could have objected to the inquiry he now challenges. His decision not to object, but rather to

encourage further inquiry, was an intentional, tactical decision that we deem a true waiver of any <u>Thomas</u> challenge to the inquiry.

Our conclusion is only reinforced by Spruill's subsequent actions. For example, rather than argue that Juror 11 should not have been questioned, Spruill's counsel indicated agreement both with how the court conducted its minimal inquiry, and with its suggestion that Juror 11 take more time to consider her ability to deliberate fairly and impartially. When specifically asked if Spruill had "[a]ny objection to anything that happened just now," defense counsel replied, "No, Your Honor," and stated, "I think we just need to give her a few minutes . . . . [W]e just have to recess and . . . be nearby . . . ." <u>Id.</u> at 548.

Most important, when Juror 11 sent her next note expressing "difficulty in making a decision on a verdict based on feelings of sensitivity toward individuals who have similar cases to Mr. Spruill" and proposing that she be excused, <u>id.</u> at 549, Spruill voiced no objection but, rather, agreed that the juror needed to be excused: "The Court: Are you [a]greed that I need to excuse her? Mr. Weingast: Yes, Your Honor," <u>id.</u> at 550.

34

In sum, the record reveals that (1) from <u>voir dire</u> forward, Spruill recognized Juror 11's potential work-related bias; (2) when, during deliberations, juror notes were ambiguous as to the reason jurors could not reach a verdict, Spruill encouraged further instructions, specifically agreeing to the district court's "conscientious view" and "conflict of interest" instructions; (3) when Juror 11 herself expressed a conflict concern, Spruill encouraged and agreed to a district-court inquiry as to the nature and extent of any bias; (4) when, upon such inquiry, Juror 11 expressed uncertainty about her ability to deliberate fairly and impartially, Spruill supported the court's decision to give the juror time to consider the matter further; and (5) when Juror 11 reported that it may be best to excuse her—because she would have difficulty returning a verdict, due to sensitivity toward persons with similar cases—Spruill's counsel agreed that she should be excused. Indeed, after Juror 11 was replaced and the jury was instructed to begin its deliberations anew, Spruill's counsel affirmed that he did not object "to anything that ha[d] transpired." <u>Id.</u> at 554.[9]

---

[9] Judge Pooler observes that Spruill challenges Juror 11's removal, not her questioning, on appeal. <u>See</u> Dissenting Op., <u>post</u> at [5]. Nevertheless, to the

This record plainly demonstrates that Spruill's counsel did not "fall asleep at the wheel" with respect to the inquiry or dismissal of Juror 11. United States v. Kon Yu-Leung, 51 F.3d at 1123. Rather, he actively engaged in the matter and agreed to every action taken by the district court. These intentional actions manifest true waiver of any challenge to the district court's inquiry and removal of Juror 11. See United States v. Quinones, 511 F.3d at 320–23.

In urging otherwise, Spruill maintains that his trial counsel's actions were not a permissible "tactical decision" and, thus, cannot demonstrate waiver. We disagree. As an initial matter, while an identifiable tactical benefit provides some evidence that the relinquishment of a right was intentional, see, e.g., id. at 320–22, we have not made a tactical benefit a prerequisite to identifying waiver where the totality of circumstances otherwise demonstrate the requisite intentional action, see, e.g., United States v. Celaj, 649 F.3d 162, 170 n.5 (2d Cir. 2011) (holding that defense counsel's agreement to factual stipulation regarding

_____

extent waiver is a product of intent, it is appropriate to review the totality of circumstances leading to Juror 11's removal to determine what intent is evident with respect to removal. See Grayton v. Ercole, 691 F.3d 165, 174–78 (2d Cir. 2012) (examining record as whole to find defendant's Confrontation Clause rights implicitly waived).

36

interstate commerce element of offense waived sufficiency challenge, without identifying tactical benefit of action). In any event, we cannot foreclose a tactical motivation for counsel's actions regarding Juror 11. Counsel may initially have thought that further inquiry would resolve tension between the first two notes in a way that would secure his client a mistrial. Thereafter, upon observing Juror 11 firsthand and hearing her repeated equivocal responses and uncertainty as to whether she could proceed impartially, counsel may have thought the juror more likely to succumb to the views of other jurors than to maintain an opposing view and, in those circumstances, thought it better to substitute the first alternate and begin deliberations anew. Or counsel may simply have recognized that the juror's final response acknowledged an extrinsic bias that compelled removal.

Whether such determinations—if, in fact, counsel's view—were objectively reasonable can, like other attorney actions, be raised on a Sixth Amendment challenge to counsel's representation. Cf. Strickland v. Washington, 466 U.S. 668, 688 (1984); United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (holding that counsel's "election to forgo an unsupported argument" reflected sound trial strategy); see also Bell v. Cone, 535 U.S. 685, 701 (2002) (rejecting habeas

challenge to state court's determination that counsel's waiver of final argument in capital case was legitimate trial tactic); United States v. Natanel, 938 F.2d 302, 310 (1st Cir. 1991) (holding that counsel's waiver of closing argument on count submitted to jury independently, "while admittedly a gamble," was reasonable strategic choice where jury had acquitted defendant on all other counts); United States v. Jackson, 918 F.2d 236, 243 (1st Cir. 1990) (stating that "counsel's failure to object to the prosecutor's remark and to request a curative instruction seems consistent with a reasonable tactical decision to minimize any harm the prosecutor's remark may have caused, by not inviting further attention to it"). Because such a challenge must generally be brought collaterally to allow adequate development of the record, see Massaro v. United States, 538 U.S. 500, 504 (2003) (recognizing that "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance"), we express no conclusive view on that matter, although our rejection of Spruill's Thomas challenge may well bear on a Sixth Amendment claim. As to waiver, we conclude only that a defense action is no less intentional, and thus, no less a "true

38

waiver," merely because a defendant may subsequently claim ineffective assistance of counsel.

We therefore conclude that Spruill, through counsel, having intentionally urged the questioning of Juror 11 and specifically agreed to her dismissal, waived the challenges that he now raises on appeal.

## III.  Conclusion

To summarize, we conclude:

1.      Spruill waived any challenge to dismissal of the juror in question by specifically telling the district court that he did not object either to its colloquy with the juror or to the juror's removal, and by in fact recommending the very disposition he now challenges.

2.      Even if Spruill had not waived any Thomas argument, the challenged juror removal is not subject to Thomas's "any possibility" rule, see 116 F.3d at 621–22, because the concern underlying Thomas, juror nullification, was not here at issue.  Rather, removal was based on extrinsic bias, a matter about which the district court could—and did—inquire without intruding on jury deliberations.

Accordingly, for the reasons stated above and in a summary order addressing the remaining issues on appeal, the district court's judgment of conviction is AFFIRMED.

POOLER, *Circuit Judge*, dissenting:

In *United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997), we held that if there is "any possibility" that a request to discharge a juror stems from the juror's view of the sufficiency of the government's evidence, the court "must deny the request." *Id.* at 622. The jury deliberating Jeff Spruill's fate was split 11-1. The foreman told the judge that the lone holdout would not change her vote. The judge interviewed the holdout, who said that she was trying her best to view the evidence impartially, but that her work with inmates in the prison system was "somewhat clouding" her views. She said that although she believed that she was coming to a fair decision, the other members of the jury disagreed. After further questioning, the juror suggested that it might be best if she were replaced. The judge did so, and the newly composed jury then promptly convicted Spruill.

Under *Thomas*, this was error. Because the record evidence disclosed the possibility that the holdout's request to be discharged stemmed from her views of the sufficiency of the government's evidence, the district court should have denied the request. The majority concludes that *Thomas*'s "any possibility" standard does not apply because the holdout expressed a potential bias, whereas in *Thomas* the concern was jury nullification. The majority then holds that, in any event, Spruill waived his *Thomas* argument when his attorney acquiesced to the juror's dismissal. Thus, Spruill receives no review—not even plain error review—of the district court's decision to dismiss the one juror who wished to acquit. Because I believe the majority opinion reads *Thomas* far too narrowly, and expands the waiver doctrine far too broadly, I respectfully dissent.

## I.     The *Thomas* Error

"[W]e subject a Rule 23(b) dismissal to 'meticulous' scrutiny in any case where the removed juror was known to be the sole holdout for acquittal." *Thomas*, 116 F.3d at 624–25; *see also United States v. Hernandez*, 862 F.2d 17, 23 (2d Cir. 1988) ("[R]emoval of the sole holdout for acquittal is an issue at the heart of the trial process and must be meticulously scrutinized.").

There can be no dispute that Juror 11 was known to be the lone holdout for acquittal. The first note from the jury indicated that there was "one juror [who] at this point . . . does not agree with the jury." App'x at 521. The note went on to state that this one juror had "doubts" and was "unwilling to change [her] vote." App'x at 521. The second note, which the court received shortly after the first, stated that "one juror feels in their gut that they have a conflict of interest." App'x at 521. After the district court instructed the jury that a true conflict of interest would need to be disclosed, Juror 11 herself wrote a note to the judge stating that her "gut feeling" was "potentially creating a bias." App'x at 536. The district court concluded from these notes that it was "reasonable to infer that the jury has taken a vote on the merits and Juror 11 is alone in opposing the other jurors," and that there were two possibilities: "either Juror 11 has a conscientious view that differs from everybody else or she's having difficulty deliberating . . . because of what might be thought of as sympathy for Mr. Spruill." App'x at 538–39. It is clear from this record that the holdout juror referenced in the first note and Juror 11 were one and the same. Thus, we must "meticulously scrutinize" the decision to remove her.

2

The district court's decision to remove Juror 11 cannot withstand such scrutiny. To determine whether to dismiss Juror 11 for cause, the district court was required to apply the evidentiary standard set forth in *Thomas* that "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." 116 F.3d at 621–22 (emphasis omitted) (quoting *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987)).

The record evidence discloses such a possibility. As noted above, the first note from the jury indicated that Juror 11 had "doubts" and was "unwilling to change [her] vote." App'x at 521. Juror 11 told the district court repeatedly that she was "trying to do [her] best . . . to make the best unbiased decisions," App'x at 542, that she was "trying to be as fair as [she] c[ould] be," App'x at 546, and that she was "trying to listen to all the evidence and . . . com[e] to a fair decision," *id.* She explained,

> I'm trying to look at the evidence and trying to make a decision on all that, and I feel like in some ways I kind of am. But somebody mentioned—I can't bring up the deliberations, but it just kind of made me think about it and it's just been difficult. And they were asking me all this stuff and I was, look, I don't know, you know. So I'm just trying to be honest about it. I'm trying to do my best . . . .

App'x at 542–43; *see also id.* at 546 ("I feel like I was coming to a fair decision, but I feel like other members also felt maybe I didn't, you know. . . . I mean, for [the] interest of the Court and everybody's time, it might just make sense to have somebody else. I just don't know.").

3

This record reveals the possibility that Juror 11 initially voted to acquit based on her conscientious view of the evidence, but that, after she learned that she was in the uncomfortable position of being the lone holdout juror, she decided that, in the interest of "everybody's time," it "ma[d]e sense" to replace her. Because the record evidence discloses this possibility, the district court erred in granting Juror 11's request to be discharged. Indeed, the *Thomas* court contemplated this precise scenario and concluded that the "any possibility" standard was necessary to protect holdouts such as Juror 11 who may feel pressure from their fellow jurors. *See* 116 F.3d at 622 ("The evidentiary standard we endorse today . . . serves to protect these holdouts from fellow jurors who have come to the conclusion that the holdouts are acting lawlessly.").

To avoid the obvious *Thomas* problem, the majority concludes that Juror 11's removal "is not subject to *Thomas*'s 'any possibility' rule" because "the concern underlying *Thomas*, juror nullification, was not here at issue." Majority Op., *ante* at 4. Nothing in *Thomas*, however, suggests that the "any possibility" standard applies only in the juror nullification context. To the contrary, the *Thomas* court stated that "courts must *in all cases* guard against the removal of a juror—who aims to follow the court's instructions—based on his view on the merits of the case." 116 F.3d at 622 n.11 (emphasis added). "Accordingly, if the record raises any possibility that the juror's views on the *merits of the case*, rather than a purposeful intent to disregard the court's instructions, underlay the request that he be discharged, the juror must not be dismissed." *Id.*

4

The majority nonetheless contends that "*Thomas* itself recognized that where concerns as to a deliberating juror's continued ability to serve arise in a context other than nullification . . . [,] its strict 'any possibility' rule is not required . . . ." Majority Op., *ante* at 21. But the *Thomas* court recognized no such exception to the "any possibility" standard. It is true that the *Thomas* court discussed how a judge may, in some circumstances, be able to determine whether to dismiss a juror for cause without any inquiry into the juror's thoughts. *See* 116 F.3d at 620 (discussing how "[e]vidence of the nature and extent of a juror's unavailability or incapacitation . . . is ordinarily available without inquiring into the substance of deliberations" (citations omitted)). But nothing in this portion of *Thomas*, which concerns a judge's *inquiry* into juror misconduct, suggests that *Thomas*'s holding concerning a judge's *dismissal* of a juror should be constrained in the manner the majority suggests.

The reasons the *Thomas* court gave for limiting a district court's ability to remove a holdout juror apply with equal if not greater force to this case. The *Thomas* court determined that the stringent "any possibility" standard was necessary because "a lower evidentiary standard could lead to the removal of jurors on the basis of their view of the sufficiency of the prosecution's evidence," *id.* at 622, and "to remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict," *id.* at 621.

In *Thomas*, the district judge received a note that a juror had a "predisposed disposition" to acquit. *Id.* at 611. The other jurors gave varying accounts for what they believed to be the basis for the juror's predisposition. One juror, for example, "described

5

Juror No. 5 as favoring acquittal because the defendants were his 'people,'" and another "suggested that it was because Juror No. 5 thought the defendants were good people." *Id.* On the other hand, "several jurors recounted Juror No. 5 couching his position in terms of the evidence." *Id.* The *Thomas* court framed this as a "nullification" issue and vacated the conviction, despite the "painstaking care and caution" with which the district judge proceeded throughout the trial, because "the record evidence raise[d] a possibility that the juror was simply unpersuaded by the Government's case against the defendants." *Id.* at 624.

Here, Juror 11 expressed a potential bias based on her experience working in the prison system, but she also stated that she was trying to be unbiased, trying to be fair, and felt that her decision was "in some ways" based on the evidence. App'x at 542–43, 546. As in *Thomas*, this evidence "raises a possibility that the juror was simply unpersuaded by the Government's case against the defendants." 116 F.3d at 624.

The *Thomas* court also found the "any possibility" standard necessary to protect the secrecy of jury deliberations. "Where . . . a presiding judge receives reports that a deliberating juror is intent on defying the court's instructions on the law, the judge may well have no means of investigating the allegation without unduly breaching the secrecy of deliberations." *Id.* at 621. Thus, the "any possibility" standard "serves to protect against overly intrusive judicial inquiries into the substance of the jury's deliberations." *Id.* at 622.

This concern is equally present here, where the judge received a report that Juror 11 was potentially defying the court's instructions on the law by allowing a bias to affect

6

her decision. It is true that in some cases of claimed bias, the true source of the bias "is both easily identifiable and subject to investigation and findings without intrusion into the deliberative process." *Id.* at 621. For example, in "instances of jurors who felt threatened by one of the parties, who are discovered to have a relationship with one of the parties, or whose life circumstances otherwise change during the course of deliberations in such a way that they are no longer considered capable of rendering an impartial verdict," *id.* at 613–14 (citations omitted), the judge can "make appropriate findings and establish whether a juror is biased or otherwise unable to serve without delving into the reasons underlying the juror's views on the merits of the case," *id.* at 621. But where, as here, the claimed bias is in the form of sympathy toward the defendant, it becomes too difficult for the trial judge to discern whether such sympathy stems from an inappropriate bias or a conscientious view of the evidence. In such cases, the "any possibility" standard is necessary "to protect against overly intrusive judicial inquiries into the substance of the jury's deliberations." *Id.* at 622.

The majority also contends that "[s]ince *Thomas* was decided, this court has reiterated that its strict 'any possibility' rule does not reach beyond nullification to other forms of juror misconduct." Majority Op., *ante* at 23 (citing *United States v. Baker*, 262 F.3d 124, 131–32 (2d Cir. 2001)). *Baker*, however, says only that "the stringent rule announced in *Thomas* applies to removal of a juror by reason of the juror's determination to vote without regard to the evidence." 262 F.3d at 131. *Baker* does not limit *Thomas* to the juror nullification context; to the contrary, it recognizes that the *Thomas* rule applies where the juror is allegedly "determin[ed] to vote without regard to the evidence." *Id.*;

7

*see also id.* ("*Thomas* ruled that a juror may not be removed for refusal to allow his or her decision to be governed by the evidence unless it is clear the motivation for the removal is not in fact the juror's nonconforming view of the sufficiency of the evidence to convict."). To be sure, the *Baker* court noted that the *Thomas* rule was "based on" the difficulty in detecting the difference between "a juror's illegal act of nullification" and "the juror's failure to be convinced of the defendant's guilt," *id.*, but nothing in *Baker* suggests that the *Thomas* rule does not apply to circumstances outside the nullification context where, as here, it is equally difficult to detect whether the juror's request to be discharged stems from an inappropriate bias or a conscientious view of the evidence.

Because I see nothing in *Thomas* itself or our case law that limits *Thomas* to cases of jury nullification, I would conclude that the "any possibility" standard applies here. Under that standard, the district court erred in removing Juror 11. Because this error is "plain" and "affect[s] substantial rights," we have discretion to correct it if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (alterations in original). As the *Thomas* court stated, "to remove a juror because he is unpersuaded by the Government's case is to deny his right to a unanimous verdict." 116 F.3d at 621. The right to a unanimous jury is a constitutional right guaranteed by the Sixth and Seventh Amendments. *Andres v. United States*, 333 U.S. 740, 748 (1948). We have recognized that this right is "inextricably rooted in our jurisprudence, and remains 'one of the indispensable features of [a] federal jury trial.'" *United States v. Pachay*, 711 F.2d 488, 494 (2d Cir. 1983) (Meskill, J., concurring) (citation and emphasis omitted) (quoting *Johnson v. Louisiana*, 406 U.S. 356,

8

369 (1972)). Given the importance of the right at stake, we ought to exercise our discretion to correct the *Thomas* error, vacate Spruill's conviction, and remand for a new trial.

**II.     Waiver**

Ultimately, the majority's entire discussion of *Thomas* is dictum because it is irrelevant to the majority's holding, which is that Spruill waived his right to challenge the removal of Juror 11. According to the majority, Spruill is entitled to no review—not even plain error review—of the district judge's decision to dismiss the one juror who wished to acquit. Before today, we have never applied the doctrine of waiver so broadly. I am deeply troubled by the majority's expansion of the waiver doctrine to bar review of Spruill's claim of error in this case, especially given the constitutional dimension of the alleged error.

"Waiver is different from forfeiture." *United States v. Olano*, 507 U.S. 725, 733, (1993). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). We have further distinguished the difference between forfeiture and waiver as follows:

> If a party's failure to [object] is simply a matter of oversight, then such oversight qualifies as a correctable "forfeiture" for the purposes of plain error analysis. If, however, the party consciously refrains from objecting as a tactical matter, then that action constitutes a true "waiver," which will negate even plain error review.

*United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995); *see also United States v. Cosme*, 796 F.3d 226, 231–32 (2d Cir. 2015) ("[I]f a 'party consciously refrains from

9

objecting as a tactical matter, then that action constitutes a true waiver, which will negate even plain error review.'" (quoting *Yu-Leung*, 51 F.3d at 1122)); *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) ("[I]f, 'as a tactical matter,' a party raises no objection to a purported error, such inaction 'constitutes a true "waiver" which will negate even plain error review.'" (quoting *Yu-Leung*, 51 F.3d at 1122)). Thus, we have stated that "courts applying [the] waiver doctrine have focused on strategic, deliberate decisions that litigants consciously make." *United States v. Dantzler*, 771 F.3d 137, 146 n.5 (2d Cir. 2014). And we have declined to hold an argument waived where there was "nothing in the record suggesting . . . a strategic, calculated decision." *Id.*

The majority concludes that Spruill waived his right to challenge the removal of Juror 11 because he "acted intentionally" when he "affirmatively agreed to and, at times, even recommended the actions he now challenges with respect to the removal of Juror 11." Majority Op., *ante* at 32. First, to be clear, nothing in the record indicates that Spruill himself ever "affirmatively agreed to" or "recommended" the removal of Juror 11. This distinction is critical because in some cases, depending on the right at issue, a defendant "must personally participate in the waiver." *Olano*, 507 U.S. at 733.

Second, the majority discusses at length Spruill's counsel's actions during voir dire and during the inquiry of Juror 11, noting that at times counsel "specifically urged the district court to undertake the very inquiry of Juror 11 that he now challenges." Majority Op., *ante* at 33. But Spruill's counsel's encouragement or approval of the district court's *inquiry* of Juror 11 is irrelevant to the court's *dismissal* of Juror 11. Spruill makes clear in his appellate brief that he "does not challenge the propriety of the

10

questioning of Juror No. 11." Appellant's Reply Br. at 10. Thus, the only action of Spruill's counsel that is relevant to the waiver issue is his statement that he agreed that the district court should remove Juror 11.

The question is whether this statement was an "intentional relinquishment or abandonment of a known right." *Olano*, 507 U.S. at 733. The answer to that question must be no because there is no conceivable reason why an attorney familiar with *Thomas* would intentionally relinquish or abandon the right to retain the one juror favoring acquittal. There is no conceivable tactical benefit to doing so. Juror 11 was Spruill's only hope.

The majority tries valiantly to come up with some tactical benefit, surmising that defense counsel "may have thought the juror more likely to succumb to the views of other jurors than to maintain an opposing view and, in those circumstances, thought it better to substitute the first alternate and begin deliberations anew." Majority Op., *ante* at 37. With respect, this argument cannot be made with a straight face. At best, an alternate juror would have voted to acquit, placing Spruill in essentially the same position he was in with Juror 11 on the panel. But Spruill's counsel had to know that the far more likely outcome was that an alternate juror would, like 11 of the 12 original jurors, vote to convict. Counsel's consent to the removal of Juror 11 could not have been a tactical decision.

The only explanation for counsel's acquiescence is that he was either unfamiliar with *Thomas* or failed to appreciate the *Thomas* error. The record supports this explanation, as neither the district judge, nor the government, nor defense counsel ever

11

mentioned *Thomas* in considering how to handle Juror 11's request to be discharged. But if counsel's acquiescence was simply due to such an oversight, it "qualifies as a correctable 'forfeiture' for the purposes of plain error analysis." *Yu-Leung*, 51 F.3d 1122; *see also Dantzler*, 771 F.3d at 146 n.5 (finding that argument was forfeited, not waived, where there was "nothing in the record suggesting . . . a strategic, calculated decision" and "[t]he applicability of [the case supporting defendant's argument on appeal] was never mentioned in the District Court"); *United States v. Villafuerte*, 502 F.3d 204, 207 (2d Cir. 2007) ("[I]ssues not raised in the trial court because of oversight . . . are normally deemed forfeited on appeal . . . .").

The constitutional nature of the right at stake further cautions against a finding of waiver here. *Thomas*'s "any possibility" standard serves to prevent the removal of a juror because she is unpersuaded by the government's evidence. 116 F.3d at 622. As noted above, to remove a juror for such a reason "is to deny [the defendant] his right to a unanimous verdict." *Id.* 621. The right to a unanimous jury is a constitutional right, *Andres*, 333 U.S. at 748, that is "inextricably rooted in our jurisprudence, and remains 'one of the indispensable features of [a] federal jury trial.'" *Pachay*, 711 F.2d at 494 (Meskill, J., concurring) (citation and emphasis omitted) (quoting *Johnson*, 406 U.S. at 369). "There is a presumption against the waiver of constitutional rights . . . ." *Brookhart v. Janis*, 384 U.S. 1, 4 (1966). "[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . do not presume acquiescence in the loss of fundamental rights." *Carnley v. Cochran*, 369 U.S. 506, 514 (1962) (quoting *Johnson*, 304 U.S. at 464–65). "Waivers of constitutional rights not only must be

12

voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970).

In *Pachay*, we held that a defendant cannot waive his right to a unanimous jury where the district court proposes accepting a non-unanimous verdict. 711 F.2d at 490. In so doing, we recognized the problem inherent in allowing the district court to seek a criminal defendant's consent to a non-unanimous jury. *Id*. Allowing such a possibility "would be unfair to the criminal defendant, who might feel coerced into agreeing to a suggestion of a non-unanimous verdict by the risk of . . . the trial judge . . . impos[ing] a harsher sentence on a non-consenting defendant . . . ." *Id.* at 490–91. Similarly, in *United States v. Chavis*, 719 F.2d 46 (2d Cir. 1983), we held that even where defense counsel introduces the idea of accepting a non-unanimous verdict, we may conclude that the right to a unanimous jury was waived only where "the trial judge ha[s] made a searching inquiry to [e]nsure that the defendant was fully aware of his right to a unanimous verdict and that he had given up that right of his own free will and not as a result of a misunderstanding, or a promise, threat or someone's suggestion." *Id.* at 48.

I read these cases to suggest that if there is any uncertainty as to whether Spruill truly intended to waive his challenge to the removal of Juror 11, we should err on the side of finding no waiver in view of the fundamental and constitutional nature of the right at stake. Here, the district court conducted no inquiry of Spruill to ensure that he wished to consent to the dismissal of the lone holdout juror. There is no evidence that defense counsel considered that Spruill might have a viable argument that the holdout juror must

13

be retained under *Thomas*. And, as noted above, Spruill gained no conceivable tactical benefit by agreeing to dismiss Juror 11. In these circumstances, I conclude that Spruill's counsel's consent to the dismissal of Juror 11 is more akin to an "oversight" than it is to an "intentional relinquishment or abandonment of a known right." Accordingly, I would review the removal of Juror 11 for plain error.

## CONCLUSION

The majority holds that the waiver doctrine bars review where counsel "acts intentionally" in conceding an argument, even if there is no tactical reason for doing so. While I believe that this expansion of the waiver doctrine is misguided as a matter of law, more fundamentally, it is unclear to me what values such an expansion serves to promote. In cases involving a tactical benefit, the waiver doctrine prevents the unfairness that would result if a party who conceded an issue at trial for tactical reasons was then allowed to raise that issue on appeal. But I see no value in denying Spruill review in this case. We simply punish Spruill for the oversight of his attorney.

I would review Spruill's challenge to the removal of Juror 11 for plain error. Under that standard, I would hold that the district court plainly erred in removing Juror 11 because the record evidence disclosed a possibility that Juror 11's request to be discharged stemmed from her status as a holdout. Accordingly, I would vacate Spruill's conviction and remand for a new trial. Because the majority opinion holds otherwise, I respectfully dissent.

14