# United States Court of Appeals
## for the Second Circuit

August Term 2021
Argued: March 1, 2022
Decided: October 14, 2022

No. 20-832

UNITED STATES OF AMERICA,

*Appellee,*

v.

JACQUELINE GRAHAM,

*Defendant-Appellant.*[*]

On Appeal from the United States District Court
for the Southern District of New York

Before:    WALKER, PARK, and PÉREZ, *Circuit Judges.*

Defendant-Appellant Jacqueline Graham was convicted after a jury trial of conspiracy to commit mail, wire, and bank fraud, in violation of 18 U.S.C. § 1349.   On appeal, Graham argues that her

---

[*] The Clerk is respectfully directed to amend the caption accordingly.

pretrial counsel was constitutionally ineffective for failing to transmit a plea offer from the government to Graham before it expired, thereby depriving her of the chance to plead guilty under the terms of the offer. *See Missouri v. Frye*, 566 U.S. 134 (2012). We conclude that Graham has waived any claim that the alleged error violated her Sixth Amendment rights. Unlike the defendant in *Frye*, Graham learned of her expired plea offer and received new court-appointed counsel two months before trial. She nonetheless chose to go to trial rather than to plead guilty or to petition the court for reinstatement of the offer. This knowing and voluntary choice was inconsistent with seeking the benefit of the expired plea offer and thus constitutes waiver. We reject Graham's remaining arguments and thus **AFFIRM**.

Judge Pérez concurs in a separate opinion.

HARRY SANDICK (Christopher Wilds, Andrew Haddad, *on the brief*), Patterson Belknap Webb & Tyler LLP, New York, NY, *for Defendant-Appellant*.

DAVID R. FELTON, Assistant United States Attorney (Michael D. Maimin, Karl Metzner, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

PARK, *Circuit Judge*:

Defendant-Appellant Jacqueline Graham was convicted after a jury trial of conspiracy to commit mail, wire, and bank fraud, in violation of 18 U.S.C. § 1349. On appeal, Graham argues that her pretrial counsel was constitutionally ineffective for failing to transmit

2

a plea offer from the government to Graham before it expired, thereby depriving her of the chance to plead guilty under the terms of the offer. *See Missouri v. Frye*, 566 U.S. 134 (2012). We conclude that Graham has waived any claim that the alleged error violated her Sixth Amendment rights. Unlike the defendant in *Frye*, Graham learned of her expired plea offer and received new court-appointed counsel two months before trial. She nonetheless chose to go to trial rather than to plead guilty or to petition the court for reinstatement of the offer. This knowing and voluntary choice was inconsistent with seeking the benefit of the expired plea offer and thus constitutes waiver.

We also reject Graham's remaining arguments on appeal. The district court did not abuse its discretion by admitting evidence of Graham's other fraudulent activity that was similar and/or related to the charged conduct; the court did not err by allowing the government to introduce certain "red flag" emails from an outside attorney for the limited purpose of proving her knowledge; and the court's decision to instruct the jury on conscious avoidance was proper. We thus affirm.

## I. BACKGROUND

A. The Government's Case

Jacqueline Graham approached struggling homeowners with an offer that was too good to be true: In exchange for a fee, her partnership (the "Terra Foundation" or "Terra") could purportedly eliminate a customer's mortgage debts in full. Styling herself as a "sovereign citizen[]," Graham pledged that she would help these homeowners fight against the prevailing "[Uniform Commercial Code (UCC)] system" by marshaling obscure parts of the "common

3

law." Joint App'x at A-676, A-1110, A-1113. In reality, however, Graham's tactics were far more mundane. She and her coconspirators would pretend to be employees of mortgagee banks, send county title offices fake notices of discharge, and convince them to erase any record of the banks' interests in the subject properties. Once Graham's scheme was uncovered, the banks reinstated their interests, but Terra's "clients" could not recover the fees they had paid. In all, the scheme temporarily erased nearly $40 million of debt in connection with over 60 mortgage loans.

To execute the fraud, Terra used a "three-step procedure": "(1) an audit, (2) a 'Qualified Written Request' [QWR] to the client's mortgage lender, and (3) the filing of a discharge of mortgage in the local clerk's office." *Id.* at A-54. Each QWR contained a series of pseudo-legal questions, purportedly based on one of Terra's "audits," demanding detailed narrative responses and documentary submissions. If Terra received no response from the lender or considered a response insufficient, it would claim that the lending bank had ceded authority over the mortgage to Terra. One of Graham's coconspirators would then claim to be an agent of the lending bank, prepare a notice of discharge, and file it with the relevant county clerk.

Terra collected substantial fees from these homeowners in consideration for the promise of debt relief. For example, Augustine Alvarez testified that in 2011, Terra employees told him that they could render his mortgage debt "reduced or eliminated." *Id.* at A-376. After paying $1100 upfront and completing a so-called "UCC Financing Statement" form, Alvarez waited for nearly a year until Terra provided him with an authentic title search showing that his

4

mortgage had been removed from county records. *Id.* at A-377. In exchange, Alvarez—who had been, prior to Terra's involvement, barely able to satisfy his mortgage payments—wrote Terra two checks for $250,000 each. Soon thereafter, Alvarez's bank notified him that the mortgage had been removed pursuant to a "fraudulent transaction" and had thus been reinstated. *Id.* at A-388. Alvarez tried repeatedly to contact Terra affiliates, who dodged his calls and ultimately refused to return his money.

The government introduced evidence that Graham had directed the fraudulent scheme as the head partner of Terra. Witness testimony suggested that she personally helped prepare the QWRs and other documents. And documentary evidence showed her control of Terra's finances, including its bank accounts.

The defense principally argued that Graham lacked the requisite knowledge of the fraudulent means of the scheme. In particular, defense counsel argued that Graham "believed in good faith that the unorthodox methods and unconventional programs that she promoted . . . would help homeowners stay in their homes." *Id.* at A-1007. To rebut this argument, the government introduced, among other evidence: (1) Graham's communications with coconspirators scolding them for sending multiple QWRs "to the same lender for the same client" because the QWRs would soon "look like some bull****," Supp. App'x at SA-90; (2) Graham's handwritten confession admitting her participation in the creation and distribution of "fraudulent mortgage discharges" and her "aware[ness] [that her] partners were committing fraudulent acts," *id.* at SA-71; (3) Graham's insistence that customers pay upfront; (4) Graham's attempts to move

5

Terra's proceeds offshore; and (5) Graham's efforts to remove her name from many of Terra's documents and bank accounts.

B.     Procedural History

1.     *Pretrial*

In November 2016, a grand jury returned an indictment charging Graham and four coconspirators with a single count of conspiracy to commit mail, wire, and bank fraud, in violation of 18 U.S.C. § 1349.   On April 2, 2019, just over one month before the scheduled trial date, the government sent a letter to the district court requesting a conference with Graham and her counsel.   The government represented that it had transmitted a plea offer to Graham's counsel on February 22, 2019 and that the offer had expired nearly one month prior to the April 2 letter.   The government had not received a response and was thus concerned that Graham may not have "received, understood, discussed with her counsel, and rejected" the offer.   Joint App'x at A-82.   The government noted that all parties still had to "invest significant time and effort into preparing for trial," so it would be advisable to act "at the Court's earliest convenience in order to ensure that Graham fully understood the plea offer and, if she intended to reject it, did so with a full understanding of the consequences of such a rejection."   *Id.*[1]

---

[1] The letter also presumed that if Graham asserted that she had not received and understood the offer, and if the government declined to reissue it, the district court would have to "hold a hearing" as late as the eve of trial, and the outcome of that hearing might be to override the government's decision not to reissue the offer.   *See* Joint App'x at A-82 (expressing concern that the hearing, if delayed, "might render all of the

The district court held a conference on April 10, 2019. Graham's counsel told the court that he had shared the "substance" of the plea agreement with Graham—he was not sure when—but he had not transmitted the agreement itself. *Id.* at A-90. Counsel explained that the reason for this was that he "knew that this plea offer would not be received well on [Graham's] part." *Id.* at A-100. Graham stated that she had not heard anything about the plea agreement until the "end of March via email." *Id.* at A-99. The court then instructed the government to provide a copy of the agreement—on the record—directly to Graham, remarking:

> I don't want this later to come back to haunt us, so to speak. I don't want there to be a claim made that this plea offer was not conveyed to [Graham], and that she didn't have an opportunity to review it and understand it; and that she has made a determination not to accept the plea offer and that we are, in fact, going to trial . . .

> I just want her to make sure . . . [that] she has a full understanding of the offer that has been made, and she has made a knowing and intelligent decision to proceed to trial if that's what she wants to do; and if she wants to go to trial, I have no problems with that. I just want to make sure that those decisions are made intelligently and knowingly, and that there is no basis for her later coming before the Court and saying that she was not aware that a plea offer was made and the consequences of it, of either accepting or denying the plea offer.

Court's, Government's, and [defense counsel's] [additional] work and preparation for naught").

*Id.* at A-90 to -92.   Graham reviewed the offer with trial counsel and, through counsel, indicated on the record that she wanted more time to consider it.   The government explained that the offer had already expired but stated that it "would probably be able to get it reauthorized" if Graham so requested and that the government was also open to "alternative ways of structuring" a deal if Graham returned to negotiations "sooner rather than later."   *Id.* at A-96. The court then reiterated that it "want[ed] the record to be clear, that [Graham had] been given an opportunity to review the plea offer that was conveyed."   *Id.* at A-97.

At the same conference and immediately after this exchange, the district court dismissed Graham's attorney due to a "breakdown of communication"—which the court partly attributed to Graham's decision to remain in California prior to trial—and appointed Graham new trial counsel.   *Id.* at A-101.   The court then stated that new counsel would "probably want an opportunity to review the plea offer as well and discuss it with" Graham, *id.* at A-105, and the court told Graham directly that if she wanted to explore further plea discussions she could do so with new counsel.   Graham acknowledged the court's instruction.

Graham did not raise the issue again with the district court at any time before trial.   At the final pretrial conference on May 31, 2019, the government stated that it had "not made any new offers" or been "asked to reopen any offers."   *Id.* at A-172.   Graham's new counsel did not dispute the government's characterization and said that he "expect[ed] to be in front of the Court on Monday ready to select a jury."   *Id.*

2.  *Trial and Appeal*

Jury selection began on June 3, 2019, almost two months after the conference regarding the government's plea offer. After a six-day trial, the jury returned a verdict of guilty. The district court sentenced Graham to 132 months' imprisonment, followed by five years' supervised release. The court also ordered over $800,000 in restitution and forfeiture.

Graham timely appealed. Oral argument was held on March 1, 2022, and we ordered supplemental briefing on Graham's ineffective-assistance claim on March 15, 2022. Briefing was completed on April 18, 2022.

## II.  DISCUSSION

A.  Ineffective Assistance of Counsel

Graham argues that her pretrial counsel's failure to communicate the government's plea offer entitles her to reinstatement of the offer, followed by resentencing. For the reasons that follow, we conclude that even assuming counsel's alleged failure gave rise to an ineffective-assistance claim, any such claim has since been waived.

1.  *Doctrinal Background*

The Constitution guarantees that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel necessarily includes "the right to the *effective* assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (emphasis added) (citation omitted). And it is well-established that the Sixth

Amendment entitles a defendant to relief when (1) counsel's "deficient performance" has (2) "prejudiced the defense" by leading to a conviction at trial or to an ill-advised guilty plea. *Id.* at 687; *see Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). A defendant satisfies the performance prong by proving that counsel failed to provide "reasonably effective assistance" in executing the defense. *Strickland*, 466 U.S. at 687. And the prejudice prong requires a defendant to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In a pair of companion cases in 2012, the Supreme Court held that the right to effective assistance "for [one's] defence" encompasses a right to effective assistance in *forgoing* a defense. In the first case, *Missouri v. Frye*, the Court held that, although no defendant has a right to a plea bargain, once such a bargain has been offered, the Sixth Amendment is violated when a defendant loses the opportunity to benefit from the offer without the advice of competent counsel. *See* 566 U.S. 134, 142-44, 148 (2012). In *Frye*, the defendant's counsel had failed to advise him that the government transmitted a plea offer before that offer expired. The defendant then entered a guilty plea without the benefit of the bargain. *Id.* at 138–39. Applying *Strickland*'s performance prong, the Court held that "[w]hen defense counsel allowed the offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires." *Id.* at 145. As for the prejudice prong, the Court explained that a defendant must show a "reasonable probability" that "they would have accepted the . . . plea offer had they been afforded effective assistance of counsel," that "the plea would have been entered without the prosecution canceling it or

the trial court refusing to accept it," and that "the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Id.* at 147. The Court did not resolve whether the defendant in *Frye* had satisfied the prejudice prong and left the issue for remand. *See id.* at 151.

In the other case, *Lafler v. Cooper*, 566 U.S. 156 (2012), the defendant alleged that he had been improperly advised to reject a plea offer and was later convicted at trial. The government conceded that defense counsel was deficient in advising the defendant not to accept its plea bargain, and the Court concluded that the defendant was indeed prejudiced by proceeding to trial rather than taking the deal. The Court then turned toward structuring a remedy aimed at "neutraliz[ing] the taint of [the] constitutional violation, while at the same time not grant[ing] a windfall to the defendant or needlessly squander[ing] the considerable resources" put toward a prosecution. *Id.* at 170 (cleaned up) (citation omitted). When the only advantage a defendant would have received by accepting the plea is a lesser sentence, remand for resentencing is proper so that a district court may "exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between." *Id*. at 171. When, however, resentencing would not "full[y] redress" the constitutional injury, the court may "require the prosecution to reoffer the plea proposal . . . [and] then [on remand] exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed." *Id.*

11

2. *Graham's Waiver*

Graham asserts that this case is directly controlled by *Frye*: The government made her an offer, which her counsel failed to convey to her. The government contends that more factual development on collateral review is needed to determine whether Graham has a viable ineffective-assistance claim and that the court should defer resolution of her claim.

We need not reach these arguments because we hold that any such ineffective-assistance claim has been waived. "[W]aiver can result only from a defendant's intentional decision not to assert a right." *United States v. Spruill*, 808 F.3d 585, 597 (2d Cir. 2015). "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010); *see also United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995) ("If . . . [a] party consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver,' which will negate even plain error review." (citation omitted)); *Hemphill v. New York*, 142 S. Ct. 681, 694–95 (2022) (Alito, *J.*, concurring) (explaining that waiver "is predicated on [either] conduct evincing intent to relinquish the right" or "action inconsistent with the assertion of that right").

In *Frye*, the defendant "had no knowledge of the [plea offer] until after he was convicted, sentenced, and incarcerated." *Frye v. State*, 311 S.W.3d 350, 352 (Mo. Ct. App. 2010), *vacated*, 566 U.S. 134. But here, Graham acknowledged the expired plea offer on the record—and was appointed new, competent counsel—nearly two

months before trial began. The government, going above and beyond its obligations, sent a letter to the district court on April 2, 2019, explaining that it had received no response to its plea offer and requesting that the court schedule a conference. The district court held a hearing on April 10, during which Graham reviewed and acknowledged the offer on the record. Graham stated that she wanted time to consider how to proceed and received new counsel to help her do so. Two months later, she proceeded to trial without any further mention to the court of the expired offer.

Graham's choice was plainly inconsistent with vindicating her rights under *Frye* and *Lafler*. Those cases held that defendants have a contingent right to benefit from a plea offer in the sense that, once an offer has been made, a defendant is entitled to the advice of competent counsel before rejecting the offer or letting it expire. *See, e.g.*, *Lafler*, 566 U.S. at 163–64 ("[I]neffective advice led not to an offer's acceptance but to its rejection. Having to stand trial, not choosing to waive it, is the prejudice alleged."). Proceeding to trial is incompatible with a pretrial plea agreement, which of course requires a defendant to enter a guilty plea.[2] Graham could not both proceed

---

[2] The concurrence disagrees that Graham waived her *Frye* right and refers to the "well-established processes and procedures to ensure that . . . a plea is entered voluntarily, knowingly, and intelligently," citing Fed. R. Crim. P. 11(b). Concurrence at 5–6. But Rule 11(b) prescribes procedures for when a defendant is "considering and accepting a guilty or nolo contendere plea"—*i.e.*, waiving the right to *trial*. Fed. R. Crim. P. 11(b). But Graham's case relates to waiver of her right to a *plea offer*, to which Rule 11(b) does not apply. *Cf. United States v. Albarran*, 943 F.3d 106, 113 & n.5 (2d Cir. 2019) (explaining that the purpose of "a *Frye* hearing" is "to ensure that a full and accurate communication on the subject has occurred" so that

13

to trial and benefit from the government's conditional offer, which—even under the special rights conferred by *Frye* and *Lafler*—required a guilty plea.  She could not have availed herself of both options in real time, so waiver rules preclude her from doing so now.

The remedy that Graham seeks highlights why her ineffective-assistance claim is waived.  Graham asks us to enter a judgment forcing the government to reinstate its old, expired plea offer so that she may now plead guilty under its terms.[3]  But Graham already chose not to pursue that offer by going to trial with full awareness of the offer's existence under the advice of competent counsel.  That is, after the April 10, 2019 conference, Graham had the option either (1) to exercise her *Frye* right to compel the government to revive the expired plea offer, and then accept that offer or negotiate its terms;[4] or (2) to proceed to trial.[5]  From at least April 10 on, Graham (with her new counsel) was aware of any *Frye* errors committed by her

---

a defendant "fully underst[ands] the terms of the plea agreement that he [is] *rejecting*" (emphasis added)).

[3] The other remedy available under *Lafler*—resentencing alone—would not make any sense here because the district court already knew about the expired plea offer well before Graham was sentenced.  In any event, either approach would be equally inconsistent with Graham's choice to go to trial because it would aim to give Graham the benefit of a plea offer that had required her to plead guilty.

[4] Even then, the district court could still exercise "discretion" in determining whether to accept the plea, and it could base that discretion on intervening events between the time of the original offer and the time of the request.  *See Lafler*, 566 U.S. at 170–71.

[5] Graham also could have negotiated with the government without first seeking reinstatement of the offer; such bargaining would have occurred in the shadow of Graham's *Frye* rights.

14

former attorney.    But she chose not to seek reinstatement of the deal, invoking her trial right instead.    Graham may not undo the consequences of that decision on appeal.[6]

Without a waiver rule, a defendant in Graham's position would have little reason to exercise her *Frye* rights before trial.    Such a defendant could instead go to trial and hope for an acquittal, knowing that she could force the government to reoffer the same, expired pretrial deal if she were convicted.[7]    Or she could try to trade her free roll of the dice for a new, better deal with the government.    Either way, *Frye* would give a defendant the option to rewind the clock after

---

[6] Graham asks us to create an exception to the "usual principles of determining waiver" for *Frye* and *Lafler* errors by requiring some sort of additional formal judicial proceeding.    Appellant's Supp. Br. at 4 (quoting *Berghuis*, 560 U.S. at 383).    We decline to do so.    Graham's two examples of special rules—*Curcio* and *Faretta* hearings—both involve circumstances in which the court cannot be sure that the defendant is adequately represented.    *See id.* (first citing *United States v. Arrington*, 941 F.3d 24, 40 (2d Cir. 2019) (describing *Curcio* hearings for possibly conflicted counsel); and then citing *Torres v. United States*, 140 F.3d 392, 401 (2d Cir. 1998) (describing *Faretta* hearings for pro se representation)).    Here, there has been no suggestion that Graham's trial counsel after the April 10 conference was ineffective, conflicted, or absent.

[7] We do not mean to suggest that courts are generally required to give a defendant the full benefit of the original bargain in cases where the ineffective-assistance claim was not waived.    To the contrary, *Lafler* emphasized that judges must use "discretion"—either in "determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between" or in "deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed."    566 U.S. at 171.    But such remedial measures do not displace ordinary waiver rules.

15

a guilty verdict, violating the Supreme Court's instruction that a Sixth Amendment remedy should not "grant a windfall to the defendant." *Lafler*, 566 U.S. at 170. This sort of gamesmanship is, of course, precisely what waiver rules guard against. *See United States v. Gersh*, 328 F.2d 460, 463 (2d Cir. 1964) (Friendly, *J.*) (noting that there would be waiver where a party had knowledge of an error "but had nevertheless stood mute, gambling on an acquittal while holding this issue in reserve").

The *Frye* Court anticipated precisely this scenario when explaining how courts can prevent "late, frivolous, or fabricated claims" of expired plea offers raised only "after a trial leading to conviction with resulting harsh consequences." 566 U.S. at 146. The Court explained that trial judges could make "formal offers . . . part of the record at any subsequent plea proceeding *or before a trial on the merits*, all to ensure that a defendant has been fully advised before those further proceedings commence." *Id.* (emphasis added). The district court heeded that advice here and recognized that a *Frye* error could "haunt" the case if not redressed immediately. Joint App'x at A-90. So the court summoned Graham to New York from California, ensured that she was aware of the offer, and required her to review it on the record. The district court stated clearly and repeatedly that the purpose of this conference was to avoid any belated claim "that this plea offer was not conveyed to [Graham]," "that she didn't have an opportunity to review it and understand it," or that Graham made anything other than a "knowing and intelligent decision to proceed to trial if that's what she wants to do." *Id.* at A-90 to -91. The court also appointed new counsel that day to aid Graham in her decision. These efforts were aimed at putting Graham in a position to exercise her *Frye* rights *before trial*, not to grant

16

her the option to seek to vacate her conviction after a guilty verdict. *See United States v. Draper*, 882 F.3d 210, 218 (5th Cir. 2018) (rejecting the argument that "*Frye* permits district judges to identify [ineffective assistance] but not to remedy it" before a trial or subsequent plea).[8] Entertaining Graham's claim now would both penalize the government for proactively bringing a possible error to the court's attention and disregard the court's conscientious efforts to correct it.

Typically, a waiver of rights arises from the choice to plead guilty, not from exercising the right to go to trial. *See* Fed. R. Crim. P. 11; *Class v. United States*, 138 S. Ct. 798, 805 (2018). Accordingly, we appreciate that it may seem unusual to cast the decision to go to trial—itself a right enshrined by the Sixth Amendment—as waiver of some other right. But that is so only because outside the context of *Lafler* and *Frye*, there is no "right" to a plea bargain at all nor a "right" that the judge accept a plea offer. *See Frye*, 566 U.S. at 148–49 (first citing *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977); and then citing *Santobello v. New York*, 404 U.S. 257, 262 (1971)). Waiver here takes a unique form because *Frye* and *Lafler* convey unique rights. A defendant waives a right to trial by pleading guilty; we have no trouble concluding that she waives a contingent right to plead

---

[8] The concurrence states that "the district court should have done more." Concurrence at 7. We respectfully disagree. The district court informed Graham of the government's offer, described the consequences of accepting or declining the offer, and suggested that Graham review the offer with new counsel. *See supra* at 7-8. In light of that colloquy, it's hard to see how Graham's decision to go to trial was not knowing and intelligent or to fault the district court for not doing more.

guilty—the kind granted by *Frye* and *Lafler*—by making a knowing and intelligent decision to proceed to trial.[9]

3.    *The Government's Purported "Waiver"*

Graham and the concurrence respond that we should look past Graham's waiver because the government did not mention waiver in its principal brief.   *See* Concurrence at 1-3.   According to the concurrence, the government abandoned this argument on appeal by failing to raise Graham's waiver in its opposition brief and expressing "serious doubt" about waiver when questioned during oral argument.   *Id.* at 1-2.    In other words, the government itself "waived" the waiver argument.

This reasoning is flawed.   To be sure, we have at times used the shorthand "waiver" to describe a party's failure to raise an argument in its brief on appeal.   *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998); *United States v. Brown*, 352 F.3d 654, 663 (2d Cir. 2003) ("waiver" of waiver argument).[10]   But as a formal

---

[9] Nothing in this opinion should be construed as holding that waiver of a *Lafler* or *Frye* right can occur *only* beginning on the first day of trial. We need not decide whether Graham's waiver occurred even earlier, *i.e.*, whether some other action she took before the start of trial was also inconsistent with timely pursuing reinstatement of the expired plea offer. For example, a defendant may not act inconsistently with exercising rights under *Frye*, learn that the government has discovered strong inculpatory evidence, and then ask the court to reinstate a stale, expired offer after the fact.   We need not develop the record here further because it is clear already that, at least by the time trial commenced, Graham's course of conduct was inconsistent with vindicating any *Frye* rights.

[10] Despite use of the term "waiver," we have never treated omission of an argument alone as the "intentional relinquishment of a known right," which is why unlike in instances of true waiver, we emphasize that a failure

18

matter, this confuses several distinct concepts. One set of rules—waiver and forfeiture—governs when a court may *subtract* from the arguments raised on appeal. Waiver, the "intentional relinquishment or abandonment of a known right" at or before the time of appeal, "extinguish[es] an error" along with any appellate review. *United States v. Olano*, 507 U.S. 725, 733 (1993) (cleaned up); *see Yu-Leung*, 51 F.3d at 1121 ("[W]aiver necessarily 'extinguishes' the claim." (citation omitted)). Forfeiture, a mere "failure to make the timely assertion of a right" when procedurally appropriate, allows a court either to disregard an argument at its discretion (in civil cases) or otherwise subject it to plain-error review (in criminal cases). *Olano*, 507 U.S. at 733; *see Greene v. United States*, 13 F.3d 577, 585–86 (2d Cir. 1994) (civil cases); Fed. R. Crim. P. 52(b) (criminal cases).[11]

A different rule, the party-presentation rule, governs when a court may *add* to the issues raised on appeal. The party-presentation rule reflects the principle that courts "normally decide only questions

---

to raise an argument does not extinguish appellate review entirely. *See Norton*, 145 F.3d at 117 (noting these arguments "*normally* will not be addressed on appeal" (emphasis added)).

[11] Graham's confusion of waiver and forfeiture also explains why her reliance on *Massaro v. United States*, 538 U.S. 500 (2003), is misplaced. There, the Supreme Court rejected this Circuit's rule that ineffective-assistance claims should be raised on direct appeal rather than collateral review. Although the Court occasionally used the term "waiver," it was expressly evaluating a rule of "procedural default"—*i.e.*, forfeiture—and accordingly determining at what time it was "preferable" to require ineffective-assistance claims after trial. *Id.* at 503–04. The case was about the efficient handling of claims, not the intentional relinquishment of a known right; procedural default, unlike true waiver, is excused with a showing of cause and prejudice. *Id.* at 504, 506.

presented by the parties" and may play only "a modest initiating role" in shaping the arguments before them. *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (citation omitted). Here, Graham raised a claim of ineffective assistance of counsel, and we ordered supplemental briefing on whether that claim was waived. Graham and the concurrence object to our decision to do so and to decide her claim on that ground now. *See* Concurrence at 1-3. This objection to the government's allegedly "abandoned claim[]" thus sounds in the party-presentation rule. *Id.* at 2. But "it cannot be a departure from the principle of party presentation to decide the issue on which the *appellant* relies for relief." *United States v. Moyhernandez*, 5 F.4th 195, 207 (2d Cir. 2021) (emphasis added), *cert. granted, vacated, and remanded on other grounds*, 142 S. Ct. 2899 (2022) (mem.).[12] In other words, because we are not "hidebound by the

<hr>

[12] Moreover, the district court was clearly concerned about the waiver issue, as it articulated at the *Frye* conference. *See supra* at 7-9. And once we ordered supplemental briefing, the government endorsed the proposition that Graham waived her claims. We thus conclude, with the benefit of supplemental briefing, that the district court ensured that Graham had the opportunity to assert her *Frye* right after being presented with the expired plea offer. *See supra* at 14-18. In any event, the government's arguments in its principal brief—mostly regarding the lack of prejudice to Graham, assuming there was deficient performance—focused on the timing of Graham's representations to the court and to the government, her appointment of new counsel, and her decision to go to trial. Our "modest initiating role" was to ask the parties whether Graham's central claim on appeal was waived. *Sineneng-Smith*, 140 S. Ct. at 1579. The parties have now fully addressed the waiver issue, and so we decide that issue today.

The concurrence states that we have engaged in a "sua sponte application[] of waiver" or even judicial immodesty. Concurrence at 3.

20

precise arguments of counsel," *Sineneng-Smith*, 140 S. Ct. at 1581, we may affirm a judgment of the district court on any ground that is directly responsive to an appellant's arguments. That is why we may affirm a judgment even when an appellee submits no brief at all. *See* Fed. R. App. P. 31(c). In considering Graham's ineffective-assistance argument, we find the issue waived, which "necessarily extinguishes" the error and our review, so we decline to opine on its hypothetical merits. *Yu-Leung*, 51 F.3d at 1121 (cleaned up).

\* \* \*

In sum, even assuming that Graham would have accepted the government's offer if it had been timely presented to her by her prior counsel, once competent counsel was appointed, she elected not to exercise her *Frye* rights and chose to take her chances at trial instead. She cannot now revive any *Frye* remedies on appeal. The record already reflects Graham's review of the plea offer and the court's appointment of new counsel, so there is no need for further fact-finding. We thus reject Graham's claim for relief without waiting for a collateral challenge.

B.  Evidentiary Rulings and Jury Charge

Graham also raises several challenges to the admission of evidence and jury instructions at trial. All are meritless.

---

We respectfully disagree. It is the concurrence's approach that would have us discredit the district court's efforts, reach the merits, and apply *Frye* to the facts of Graham's case. *See id.* at 11–12.

1. *Other Acts Evidence*

At trial, the government introduced evidence of (a) Graham's participation in an electronic funds transfer ("EFT") scheme that purported to eliminate debts by writing checks against a zero-balance checking account; and (b) Graham's attempts to improve a victim's credit score using sham methods. As to both sets of evidence, the district court provided a limiting instruction that the evidence could be used only to show intent, mental state, or lack of good faith. We review for abuse of discretion. *See United States v. Rowland*, 826 F.3d 100, 114 (2d Cir. 2016).

Graham argues that admitting this evidence ran afoul of Federal Rule of Evidence 404(b), which provides:

> (1) *Prohibited Uses.* Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

In general, "'[o]ther act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011). "This Circuit follows the 'inclusionary' approach, which admits all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *Id.* at 56 (citation omitted). Relevance toward a permissible purpose often turns on

the similarity between the prior act and the charged offense. *See, e.g.,* *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002).

### a. EFT Scheme

The government introduced evidence that, concurrently with the charged fraud, Graham instructed a coconspirator, Rocco Cermele, to etch markings on checks in "[c]ertain colors" of ink so that they could be drawn against closed checking accounts to cover Cermele's debts. Joint App'x at A-799. The evidence included two email chains between Graham and Cermele. In the first, Graham says that she will detail the method to Cermele, and in the second, Cermele explains that his efforts to avail himself of the scheme were fruitless.

We agree with the government that this evidence was probative of Graham's fraudulent intent. At trial, Graham's principal defense was that she lacked the requisite mental state for a fraud conspiracy conviction. "[W]here it is apparent that intent will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief . . . ." *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992). Even when "the [other bad] acts and the charged conduct d[o] not involve exactly the same co-conspirators, [conduct], or temporal timelines," the evidence may still be "[]sufficiently relevant or probative" to be admitted. *United States v. Dupree*, 870 F.3d 62, 77 (2d Cir. 2017). Here, the EFT scheme was done at the same time as the charged conspiracy, with the same coconspirators, and with the same hallmarks—"unconventional" financial techniques used to purportedly discharge debt. The district court properly admitted this evidence.

### b. Credit Repair Scheme

The government also introduced testimony from one of the victims of the charged fraud, Sherry Hopple. According to Hopple, Graham had induced her to redirect $25,000 worth of mortgage payments to Graham, after which Hopple would declare bankruptcy. When this ploy did not save Hopple and her husband from financial trouble, the pair had to leave their home, and her husband's credit score plummeted. Graham said that she could boost that score into the 700s or 800s as she had purportedly done for three other clients—indeed, supposedly removing any record of their foreclosures from their credit reports within ten days.

We agree with the government that this evidence was properly admitted as "direct evidence of the crime charged" because it "arose out of the same transaction or series of transactions as the charged offense, . . . [was] inextricably intertwined with the evidence regarding the charged offense, or . . . [was] necessary to complete the story of the crime on trial." *United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012) (citation omitted). First, the evidence tended to show conduct that was intertwined with the charged fraud, of which Hopple was a victim. Second, the jury could have found that the credit repair scheme served to "lull" Hopple into not reporting Graham or working with authorities against her. *Cf. United States v. Lane*, 474 U.S. 438, 451–52 (1986) (explaining that lulling can be in furtherance of fraudulent conduct). Third, Graham's purported offer to help could be taken as evidence of fraudulent intent by taking steps to mask her missteps. *See United States v. Kelley*, 551 F.3d 171, 176 (2d Cir. 2009) (holding that subsequent acts to hide a fraud "indicate[d] that [Defendant's] actions in defrauding his clients were

not simple mistakes but were instead part of a larger, intentional scheme to defraud"). Any one of these reasons would be sufficient to admit the evidence, and the district court did not abuse its discretion by doing so.

### 2. *Red-Flag Evidence*

The government also introduced certain "red flag" emails sent among Graham, Cermele, and an outside attorney. The attorney, after learning of Graham's methods, gave a detailed explanation of why they were illegitimate. Referring to those methods, he summarized that he could "unequivocally say that the filing of those liens, the transfer of the properties, the creation of the trusts, etc., constitutes a crime." Joint App'x at A-1107. Graham responded by asserting that this attorney was uneducated in the "common law," and she later wrote that "title companies . . . are LAWYER owned and part of the UCC system we fight against." *Id.* at A-1110, A-1113. The district court instructed the jury to use these emails as evidence only of Graham's intent, knowledge, or lack of good faith.

Graham contends that these emails were inadmissible hearsay, *see* Fed. R. Evid. 801, 802, and that they unduly prejudiced the jury by providing a legal opinion, *see Cameron v. City of N.Y.*, 598 F.3d 50, 62 (2d Cir. 2010). Again, we disagree. The evidence was introduced not for the truth of the matter asserted—*i.e.*, that Graham's actions were in fact illegitimate—but rather to show her fraudulent intent and, indeed, her knowledge that she was breaking the law. In other words, the evidence "rebut[ted] [Graham's] argument that [she] had no reason to know [her conduct] was fraudulent." *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006).

25

Nor did the emails create a risk of prejudice that substantially outweighed their probative value. *See* Fed. R. Evid. 403; *United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994) (noting that we look at "whether the probative value of th[e] evidence for its non-hearsay purpose is outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement"). The danger of prejudice was low because there was no reasonable dispute that Graham used illegitimate means to eliminate the debts of Terra's clients. And the probative value of the evidence was high because it tended to undermine Graham's argument that she lacked mens rea. Moreover, the court gave a limiting instruction that the evidence could be considered "for a very limited purpose" as to her intent, which it repeated during the general jury charge. Supp. App'x at SA-56. The "law recognizes a strong presumption that juries follow limiting instructions." *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006). We thus conclude that admission of the evidence was not an abuse of discretion.

3. *Conscious-Avoidance Instruction*

Finally, Graham argues that the district court erred by instructing the jury on conscious avoidance, also known as willful blindness. In general, a criminal conspiracy conviction requires actual knowledge of the unlawful aims of the conspiracy, but a "defendant's conscious avoidance of knowledge of the unlawful aims of the conspiracy . . . may be invoked as the equivalent of knowledge of those unlawful aims." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003). The conscious-avoidance doctrine applies to a defendant who "consciously avoided learning [a] fact while aware of a high probability of its existence." *Id.* at 477 (citation omitted); *see*

26

*also Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766–67 (2011). An instruction on the doctrine is proper when the "factual predicate for the charge" exists such that "a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Svoboda*, 347 F.3d at 480 (cleaned up). We review jury instructions de novo and find error only if "the charge, taken as a whole, [is] prejudicial." *United States v. Caban*, 173 F.3d 89, 94 (2d Cir. 1999).

We conclude that there was sufficient evidence for a rational jury to conclude that Graham consciously avoided evidence of wrongdoing. In addition to the "red flag" emails, *see supra* Section II.B.2, and much of the evidence of actual knowledge, *see supra* at 5-6, the government introduced evidence showing Graham's active disregard of information tending to show a high probability of the fraudulent aims of the conspiracy. For example, the government introduced comments from title companies expressing alarm at Graham's methods. It also recounted that law enforcement raided Graham's office in 2012, after which Graham's criminal conduct continued. The government's evidence served to show that Graham ignored these signals and told others not to engage with outside lawyers or the title companies. There was therefore ample basis for the district court's conscious-avoidance instruction.

## III.  CONCLUSION

Graham's ineffective-assistance claim was waived, and her remaining arguments are meritless. For the foregoing reasons, the judgment of conviction is affirmed.

27

PÉREZ, *Circuit Judge*, concurring in the judgment as to Section II.A:

There is no debate that "criminal defendants require effective counsel during plea negotiations" and that "anything less might deny a defendant effective representation by counsel at the only stage when legal aid and advice would help him." *Missouri v. Frye*, 566 U.S 134, 144 (2012) (cleaned up). Binding precedent does not treat the right to counsel during plea negotiations with short shrift.

I agree with the majority opinion that we should reject Graham's claim, though I would do so on the merits, instead of finding waiver, because she is not able to prove the requisite prejudice. As such, I respectfully concur in the judgment of the Court in Section II.A, but not its discussion and conclusion as to waiver. I fear that the majority opinion—after reaching beyond what the parties initially argued—has muddied the waters concerning the right to effective assistance of counsel in plea bargaining by finding waiver.

## I.

The Court should not have reached for waiver here. To speak plainly: the government abandoned this argument. The government did not raise waiver in its opposition brief—it even expressed serious doubt on whether there was a waiver when first questioned about it during oral argument.[1] "It is well established that an argument not raised on appeal is deemed abandoned[.]" *United States v. Quiroz*, 22 F.3d 489, 490 (2d Cir. 1994) (internal quotation marks omitted); *see also United States v. Olano*, 507 U.S. 725, 732–33 (1993) (a party forfeits an argument when it "fail[s] to make the

---

[1] Counsel stated during oral argument that "ineffective assistance [] can be raised for the first time in collateral review, so I'm not sure that the defendant was obligated to raise it at the time" before the district court. Oral Arg. Audio Recording at 17:35–18:00.

timely assertion of a right," subjecting it to plain error review); *cf. JLM Couture, Inc. v. Gutman*, 24 F.4th 785, 801 n.19 (2d Cir. 2022) (declining to address "belatedly" made arguments raised in reply brief on appeal). Of course, this Court may consider abandoned claims if "manifest injustice would otherwise result[.]" *Quiroz*, 22 F.3d at 491. But no one—even now after the government was prodded by this Court to make a waiver argument—argues such manifest injustice would occur here if we considered Graham's ineffective assistance claim.[2] Respectfully, I see much irony in that the majority opinion easily finds Graham's *Frye* claim waived but declines to find the government's new argument abandoned given that the government would not have asserted waiver if not for a request for supplemental briefing by this Court.

While it is true that there is "no right to be offered a plea . . . nor a federal right that the judge accept it," *Frye*, 566 U.S. at 148 (internal citations omitted), there is no question that the Sixth Amendment enshrines the right to counsel—"a right that extends to the plea-bargaining process," *Lafler v. Cooper*, 566 U.S. 156, 162 (2012); *see also Frye*, 566 U.S at 138 ("The right to counsel is the right to *effective* assistance of counsel." (emphasis added)). As such, "the right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences." *Lafler*, 566 U.S. at 170; *see also Frye*, 566 U.S. at 143 ("The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process,

---

[2] In fact, the government initially suggested additional fact finding could be useful and that the Court should consider Graham's ineffective assistance claim if presented via a 28 U.S.C. § 2255 motion, as an alternative argument to the record not supporting her claim.

responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages.").

Something as bedrock to our criminal justice system and judicial process—the right to effective assistance of counsel—demands the judiciary be modest in its approach to doctrines that may serve to limit the right, such as waiver. *See, e.g., Carnley v. Cochran*, 369 U.S. 506, 514 (1962) ("[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . do not presume acquiescence in the loss of fundamental rights." (internal quotation marks omitted)). Accordingly, when a fundamental right such as the right to effective assistance of counsel is implicated, sua sponte applications of waiver should be made with considerable restraint.

## II.

Even if waiver had been raised by the government in its initial briefing, the government did not overcome the presumption against waiver, or meet its burden for us to find Graham's purported waiver was knowing and intelligent.

"There is a presumption against the waiver of constitutional rights[.]" *Brookhart v. Janis*, 384 U.S. 1, 4 (1966). "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." *Olano*, 507 U.S. at 733.

"Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Id.* (internal quotation marks omitted). There is no dispute that the Court has

3

discretion to correct certain errors that were forfeited using a plain error analysis, and that, in most cases, forfeiture occurs when a defendant fails to assert an objection in the district court due to mistake or oversight.  *See United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 2015).  But the Court has no such discretion to conduct a plain error review if there was a true waiver.  *See id*.  The government must prove waiver by a preponderance of the evidence.  *See, e.g., Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).  Where this Court has found waiver, "the record has supported the critical determination that the defendant . . . acted intentionally in pursuing, or not pursuing, a particular course of action."  *United States v. Spruill*, 808 F.3d 585, 597 (2d Cir. 2015).

**A.**

The record does not support a finding by a preponderance of the evidence that any purported waiver was knowing and intelligent. *See Berghuis*, 560 U.S. at 384; *see also Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.").

This Court has recognized several instances where the district court must conduct a meaningful inquiry with the defendant to ensure that the waiver of a constitutional right was knowing and intelligent. *See, e.g., United States v. Ferguson*, 758 F.2d 843, 850–51 (2d Cir. 1985) (noting requirement that waiver of indictment be made in open court, where the defendant is "informed of the nature of and the cause for the accusation, and the court must be satisfied that the defendant[] waive[s] their right[] knowingly, intelligently and voluntarily" to safeguard Fifth Amendment right to an indictment); *United States v. Arrington*, 941 F.3d 24, 39–40 (2d Cir. 2019) (requiring

4

the defendant participate in *Curcio* hearing for possibly conflicted counsel to safeguard Sixth Amendment right to effective assistance of counsel); *Torres v. United States*, 140 F.3d 392, 401 (2d Cir. 1998) (requiring the defendant participate in *Faretta* hearing before allowing the defendant to proceed pro se to safeguard Sixth Amendment right to counsel); *see also United States v. Carmenate*, 544 F.3d 105, 108 (2d Cir. 2008) ("strongly encourag[ing] the district court to give appropriate warnings and question a defendant on the record" before finding waiver of right to jury trial).[3]

And there is no dispute that deciding to waive the constitutional right to trial and instead plead guilty is among the decisions that a defendant must personally participate in, and there accordingly are well-established processes and procedures to ensure that such a plea is entered voluntarily, knowingly, and intelligently. *See* Fed. R. Crim. P. 11(b), (c); *Taylor v. Illinois*, 484 U.S. 400, 417–18, 418 n.24 (1988); *see also Brookhart*, 384 U.S. at 7–8; *United States v. Livorsi*, 180 F.3d 76, 79–80 (2d Cir. 1999) (explaining that Rule 11 is "designed to assist the district judge in making the constitutionally

---

[3] The majority opinion dismisses *Arrington* and *Torres* as inapposite because each "involve[s] circumstances in which the court cannot be sure that the defendant is adequately represented." Op. at 15 n.6. The animating concern of *Arrington* and *Torres*, ensuring the Sixth Amendment right to adequate assistance of counsel, is present here. In any case, the district court had good reason to believe that Graham had not been adequately represented in plea negotiations before she was appointed new counsel, because former counsel indicated that he had only conveyed the "substance" of the plea agreement, but not the offer itself, and Graham indicated that that communication was in late March—seemingly after the offer had expired. Joint App'x at A-90, A-99. While there has been no claim that counsel after the April 10 conference was ineffective, that does not mean the district court should not have taken steps to ensure any earlier Sixth Amendment violation was actually adequately remedied.

5

required determination that a defendant's guilty plea is truly voluntary" and that the defendant "knows the consequences of doing so" (quoting *United States v. Maher*, 108 F.3d 1513, 1520 (2d Cir. 1997)). *Frye*, which indisputably implicates both the right to effective counsel and the right of a defendant to accept a plea offer once made, *see* Op. at 17–18, *Frye*, 566 U.S. at 148–49, accordingly demands a robust process.[4]

As the majority opinion aptly notes, it is not as if "*Frye* permits district judges to identify [ineffective assistance] but not to remedy it before a trial or subsequent plea." Op. at 17 (quoting *United States v. Draper*, 882 F.3d 210, 218 (5th Cir. 2018)) (internal quotation marks omitted). To its credit, the district court did acknowledge the potential *Frye* issue and raised its concern for the parties, stating that it did not want this *Frye* issue "to come back to haunt us, so to speak." Joint App'x at A-90. Recognizing that the scenario was dynamic and unfolding in real-time, merely acknowledging the potential for a *Frye*

---

[4] As the majority opinion highlights in citing *United States v. Albarran*, *Frye* hearings involve distinct procedures, where the "court strives to ensure that a full and accurate communication on the subject has occurred" so a defendant "fully underst[ands] the terms of the plea agreement that he [is] rejecting." 943 F.3d 106, 113 & n.5 (2d Cir. 2019); Op. at 13–14 n.2. But Graham did not have a *Frye* hearing like the defendant in *Albarran*, where before the defendant stated on the record that he was rejecting the government's proposed plea agreement, the government reviewed the specific terms of the proposed plea agreement, identified the elements to which the defendant would plead guilty, listed the rights the defendant would forfeit by entering a guilty plea, and described the Sentencing Guidelines' application to the defendant's conviction. *Id*. at 113. And during the *Frye* hearing in *Albarran,* the defendant was present when the parties discussed the evidence that they would present and "each side candidly acknowledged the strengths and weaknesses of its case." *Id*. The district court here conducted no such hearing or inquiry with Graham, and thus could—and in hindsight should—have done more. *See* Op. at 17 n.8.

6

issue does not provide the groundwork for finding waiver. *See Arrington*, 941 F.3d at 43 (noting that the key for waiver is not whether "a trial judge recited any particular litany of questions[,]" but whether "the defendant appreciated his predicament and made a properly informed choice"); *see also United States v. Jenkins*, 943 F.2d 167, 176 (2d Cir. 1991) (referring to "the common sense notion that the existence of a knowing and intelligent waiver inevitably depends upon the particular facts and circumstances surrounding each case, including the background, experience, and conduct of the accused" (cleaned up)).

Once a potential *Frye* issue arose, to ensure any *Frye* right was knowingly and intentionally waived, the district court should have done more than flag it and rest on the assurance of the allegedly ineffective counsel.[5] Besides the statements to former counsel, there was no further inquiry of whether Graham wanted the plea offer ordered reopened (or if she even knew she could request that), or whether there was a knowing and voluntary waiver of her *Frye* right. Indeed, even when counsel for the government addressed waiver for the first time after the Court raised it during oral argument, counsel stated, "I don't know if I would style it as a knowing relinquishment." Oral Arg. Audio Recording at 17:20–28. Without more, the

---

[5] The district court stated that it "just want[ed] to make sure that those decisions [concerning the expired plea agreement] are made intelligently and knowingly, and that there is no basis for [Graham] later . . . [to] say[] that she was not aware that a plea offer was made and the consequences of it, of either accepting or denying the plea offer." Joint App'x at A-91–A-92. Counsel—who admitted on the record to not having timely shared the plea agreement with his client—responded that he had "accomplished that." *Id.* at A-92. This is an important point, and the majority opinion does not adequately engage with it: the district court's explanation and the subsequent assurance came from *former* trial counsel who—moments later—was replaced.

7

government has not sufficiently demonstrated the purported waiver was knowing and intelligent.

## B.

Waiver also cannot be found here because it does not appear, by a preponderance of the evidence, that Graham made a strategic, calculated decision to waive her *Frye* right. "[W]aiver can result only from a defendant's intentional decision not to assert a right." *Spruill*, 808 F.3d at 597. "As a corollary, if a party consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver[.]'" *United States v. Cosme*, 796 F.3d 226, 231–32 (2d Cir. 2015) (internal quotation marks omitted). "[C]ourts applying [the] waiver doctrine have focused on strategic, deliberate decisions that litigants consciously make." *United States v. Dantzler*, 771 F.3d 137, 146 n.5 (2d Cir. 2014). While the Court has declined to make a "tactical benefit a prerequisite to identifying waiver[,]" it is certainly "evidence that the relinquishment of a right was intentional[.]" *Spruill*, 808 F.3d at 599. We have accordingly declined to hold an argument waived when there was "nothing in the record suggesting . . . a strategic, calculated decision[.]" *Dantzler*, 771 F.3d at 146 n.5.

The majority opinion concludes Graham waived her *Frye* right because she chose to take her case to trial. But this high-level characterization dismisses the complete picture of Graham's circumstance. The court replaced allegedly ineffective counsel with new counsel, and Graham went to trial where she sought an acquittal largely on the basis that she lacked the requisite intent.[6] Advancing

---

[6] Graham's defense strategy focused on the contention that she lacked the requisite intent to defraud and believed in good faith in the legality of her actions—to the point where the government sought a conscious avoidance charge.

8

to trial with the hope and belief that a jury would acquit, without requesting the government reopen its plea offer, does suggest that Graham *would not* have taken the plea had she been properly advised—which speaks to the lack of requisite prejudice, not waiver.[7] *See Lafler*, 566 U.S. at 164 (requiring the defendant show that "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea . . . .)"). This case would not

---

[7] Of course, a defendant advancing to trial after learning of a plea offer does not necessarily mean that the defendant would not have accepted a plea offer, had they been properly advised by counsel. The Court's usual practice to defer resolution of such claims on direct appeal to allow further development of the evidentiary record is a sound one. For this case, however, we can resolve the issue now because Graham's assertion of prejudice is not "accompanied by some 'objective evidence'" and instead relies "solely on [her] own, self-serving statement post-verdict that [she] would have accepted a more favorable plea deal." *United States v. Bent*, 654 F. App'x 11, 13 (2d Cir. 2016) (summary order).

Among other facts, the district court informed Graham's new counsel that there was an expired plea offer that the government indicated could come back on the table if Graham indicated an interest in pursuing it. At the final pretrial conference, Graham's counsel did not dispute the government's characterization that there had been some discussions of "resolving the matter short of trial," but that it was the government's understanding that Graham was "not seeking resolution, so [the government had] not made any new offers, nor [had it] been asked to reopen any offers." Joint App'x at A-172. Counsel merely stated that he was "ever hopeful of resolving [this] matter," but expected to be before the jury the following week. *Id.* This suggests Graham's lack of interest in the original plea offer, such that Graham is not able to show there was a reasonable probability she would have accepted the plea offer. The majority opinion instead interprets these events as evidencing waiver. As I discuss *supra* Section I, I believe that approach is inappropriate and unnecessary here, given the presumption against waiver of constitutional rights and that this Court raised waiver sua sponte, to the government's initial skepticism.

result in the "windfall" scenario *Lafler* warns of, for it does not present a credible worry that a defendant could seek a tactical benefit by waiting to raise a *Frye* claim on appeal where ineffective counsel during plea bargaining was replaced before trial. *See id.* at 170, 172. Here, there simply is "nothing in the record suggesting . . . a strategic, calculated decision" to decline a possible reinstatement of the government's plea offer, only to potentially resurrect the claim on appeal after losing at trial—or even sandbag the government on appeal. *Dantzler*, 771 F.3d at 146 n.5. The majority thus should not have found waiver.

## C.

By finding waiver, the majority opinion fails to grapple with the practical realities of the situation Graham faced in the time between the April 10, 2019 hearing (where the district court appointed new counsel), and the May 31, 2019 final pretrial conference (where the district court asked "whether or not the parties have discussed any possibility of resolving this [case] short of trial?"). Joint App'x at A-171–A-72. The district court made clear during the April 10 conference that it "intend[ed] to stick to th[e] trial schedule that [it] already set." *Id.* at A-95. And while it did move the trial date back by approximately one month to allow newly appointed counsel to get up to speed, the district court set the trial date as commencing only two months from the appointment. During the April 10 conference, the government—at several points—made clear that the "plea offer has technically expired" and that it doesn't "bid against [itself]. That is, we don't keep on making new plea offers." *Id.*; *see also id.* at A-96. The government also explained that "the closer we get to trial, the less flexible [the government is] likely to be to the extent that we have

10

flexibility in plea negotiation. . . . [T]he longer she waits, the less likely it is that it will benefit her[.]" *Id.* at A-95–A-96.[8]

As already explained, Graham's new counsel was preparing for a two-week trial—on two months' notice—which entailed learning the record and communicating with former trial counsel about the case. Raising concerns about deficiencies regarding former counsel's performance for the purpose of requesting a *Frye* remedy would have hindered new counsel's ability to receive information and context from former counsel. *Cf. Massaro v. United States*, 538 U.S. 500, 506 (2003) (explaining challenges for appellate counsel when preparing an appeal that also attacks actions of trial counsel). Additionally, requiring new counsel to raise an ineffective assistance of counsel claim immediately after appointment would create a "perverse incentive[]" to raise potentially frivolous issues just to avoid subsequent allegations of waiver, "creat[ing] inefficiencies[.]" *Id*. at 506–07. *Massaro* evaluated a rule of "procedural default" to determine it is "preferable" to bring ineffective assistance of counsel claims under 28 U.S.C. § 2255 instead of by direct appeal. *Id.* at 504. The same considerations are applicable to declining to find waiver because of the unique nature of raising an ineffective assistance of counsel claim.

## III.

The majority opinion's finding of wavier here appears to be a solution in search of a manufactured problem. Indeed, the majority

---

[8] The government restated the same sentiment on several more occasions throughout this hearing, including that "[the offer] has been taken off the table, . . . " Joint App'x at A-96, and "[the government has considered] discussing alternative ways of structuring the plea, but again, the longer she waits, the less likely it is that it will work out[,]" *id*.

11

opinion searches for a solution when waiver was not even advanced by the government until it was ordered to brief it. Even so, the government has not established by a preponderance of the evidence that Graham knowingly and voluntarily waived her *Frye* right. Nonetheless, I respectfully concur that we should reject her claim. Graham's ineffective assistance claim may be considered, and rejected, under existing precedent, because Graham has not demonstrated there was a reasonable probability that she would have accepted the plea offer. *See Lafler*, 566 U.S. at 164.